## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| United States of America, | Case No. 21-cr-116 (DWF/ECW) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Gasper Grajeda Sanchez, | |
| Defendant. | |

---

On May 13, 2021, Defendant Gasper Grajeda Sanchez ("Defendant" or "Grajeda Sanchez") was indicted on a count of Conspiracy to Distribute Cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count 1), and Possession with the Intent to Distribute Cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A) (Count 2). (Dkt. 1.)

This matter is before the Court on Defendant's Pretrial Motion to Suppress Search and Seizure (Dkt. 28). This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. The Court held a hearing on the Motion on January 31, 2023. (*See* Dkts. 40, 43.) Allen Slaughter, Jr., Assistant United States Attorney, appeared on behalf of Plaintiff United States of America ("the Government") and Shannon Elkins, Assistant Federal Defender, appeared on behalf of Grajeda Sanchez, who was present at the hearing. (*Id.*) The parties have filed post-hearing briefs. (Dkts. 49, 53.)

At the hearing, Defendant's counsel stated that while a motion to suppress statements had not been filed, it was understood through testimony at the hearing that there were statements made by Defendant while he was in the back of a squad car, before he was read his *Miranda*[1] rights. (*Id.* at 183:18-185:9.)[2] Counsel stated her intent to move to suppress those statements. (*Id.*) Grajeda Sanchez now seeks suppression of those statements in his post-hearing brief. (*See* Dkt. 49 at 16.)[3]

This matter is ripe for decision.

## I.    BACKGROUND

The Government called three witnesses to testify at the January 31, 2023 hearing: Trooper Chad Mills; Trooper Jacob Ruppert; and Sergeant Doug Rauenhorst.

### A.    Testimony of Trooper Chad Mills

Trooper Mills[4] testified that he has worked for the Minnesota State Patrol for 23 years and had also been a city police officer for a little under two years. (Dkt. 43 at 7:24-8:3; 8:21-25.) Trooper Mills stated that he underwent criminal interdiction and canine training; that he began instructing canine courses in 2001 and "worked two canines up

---

[1]    *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2]    All citations to the transcript of the January 31, 2023 hearing are in page:line format.

[3]    All page number citations are to the CM/ECF pagination unless otherwise noted.

[4]    Trooper Mills, who was promoted to Sergeant in 2016, was often referred to as "Sergeant Mills" during Trooper Ruppert and Sergeant Rauenhorst's testimonies. (*See e.g.*, Dkt. 43 at 16:7-10; 112:17-18; 113:2-5; 149:25; 152:5-6.) Similarly, the parties referred to Sergeant Rauenhorst as "Trooper Rauenhorst" in their post-hearing briefing. (Dkt. 49 at 2, 4-5; Dkt. 53 at 2,6.)

until 2016" "primarily on Interstate 90." (*Id.* at 9:4-11:24.) Through that work, Trooper Mills "gained a lot of experience assisting state, local, federal, in helping locate hidden compartments" and acquired more experience as the years passed. (*Id.* at 11:24-12:2.) Trooper Mills became his unit's canine trainer in 2008, teaching other troopers "what to look for roadside, how to locate compartments, how they operate, the different component" as well as conducting "dog training" and "criminal patrol and search and seizure class[es]." (*Id.* at 12:2-12.) Trooper Mills testified that in order to become the unit's canine trainer, he completed "a U.S. Border Patrol training course to teach us to select dogs, how to train them; and then we also had to go through a course to instruct the handlers." (*Id.* at 9:24-10:4.) Trooper Mills stated that the use of a canine is tied to the concept of interdiction in that the "dog is really just a tool" in performing a successful interdiction, that for his agency, they try to find "troopers that have kind of a knack to pick up on people's behaviors, things in the vehicle, kind of we call it looking beyond the traffic ticket[,]" and that "the dog is kind of a tool to help us confirm our suspicion and help us locate, more or less, the concealed stuff that's in compartments where we can't just see it in a trunk or where it's an easy place to find, and then that speeds up time, too." (*Id.* at 12:13-25.) Troopers respond to crashes, perform traffic stops, and the dog is "just with [them] during that patrol" as "basically a tool" for when needed. (*Id.* at 15:13-18.)

Trooper Mills testified that he is a judge and certified trainer with the United States Police Canine Associations, which is an "outside agency" that reviews all his training materials, the courses he has taken, and requires "dogs that certify under their standard." (*Id.* at 10:14-21.) As a judge, he "critique[s] teams as they try to pass a

3

certification test to meet the standards, so [he] judge[s] the handlers as far as how they read the dog, the dog's behavior, and correctly pinpointing sources regardless of distractions" and then "score[s] them" based on what is observed.  (*Id.* at 11:5-12.) Trooper Mills' unit also certifies with the North American Police Work Dog Association, and he is an accredited trainer with that organization.  (*Id.* at 10:22-25.)  Given his position as a canine coordinator, tasked with overseeing the canine program and interdiction training, Trooper Mills has not primarily been "on the road" since 2016 when he was promoted to sergeant.  (*Id.* at 16:5-10.)  However, generally, the primary duty of state troopers is traffic safety.  (*Id.* at 16:11-14.)

Trooper Mills has performed roughly 20,000 traffic stops in 23 years, approximately 18,000 of which were performed during his time as a "canine" trooper. (*Id.* at 13:1-15.)  He testified that his experience "in the concept of developing facts with regard to a reasonable articulable suspicion" has resulted from his "function" as Minnesota State Patrol trooper.  (*Id.* at 15:2-18.)  Trooper Mills testified that research performed for interdiction training showed his unit had a total of just over 20,000 traffic stops in a year and deployed dogs in less than 5% of them, which has been typical during the course of his time as a state patrolman.  (*Id.* at 13:19-15:1.)  That research was conducted to "get a number to make sure that our troopers are stopping the right vehicle, asking the right questions and not over-deploying and that we're actually developing a reasonable suspicion."  (*Id.* at 14:3-6.)

Trooper Mills testified that he had experience with "fake or cloned commercial vehicles," including vehicles that were "more like construction fronts."  (*Id.* at 28:14-19.)

Such vehicles "will have tools, different things in the vehicle that are all rusted" and "are not taken care of the same as a normal construction worker" would care for them. (*Id.* at 28:19-21.) According to Trooper Mills, "a lot of it is just the initial glance so they blend in and don't draw attention to them, but once when [sic] they are stopped, that's when you see a lot of discrepancies from what normal businesses or companies are doing compared to criminals that are trafficking various contraband." (*Id.* at 28:24-29:3.) According to Trooper Mills, these vehicles are "staged" where the occupants of a vehicle that are trafficking illegal materials formulate "a story so if you do get stopped, this is what we're saying, and this is where we're going." (*Id.* at 29:8-30:2.) But the story is "usually very vague, and as soon as you start looking into things deeper, that's when it kind of falls apart because it's not a real story." (*Id.* at 30:2-4.) Staging takes different forms, including "where [the occupants of a vehicle] said that they are doing construction work, but their clothing and what we're seeing in the vehicle doesn't coincide with what their business is," including because "their hands are clean" and "[t]hey don't have bruised fingernails from hitting them with a hammer, stuff like that." (*Id.* at 29:19-24.) The majority of Trooper Mills' experience involves dealing with lawful motoring public and legitimate commercial vehicles, but he has encountered staged commercial vehicles about four or five times in his career. (*Id.* at 29:4-7; 30:13-19.)

On February 8, 2021, Trooper Mills was "working a canine saturation," which is conducted quarterly "in an area" and is "basically a traffic safety/traffic enforcement detail with commercial vehicles, flight, regular troopers that work that area," where they "kind of enforce everything," including "speed enforcement, seatbelt, distracted driving"

and utilize resources for "human trafficking, drug trafficking, other crimes." (*Id.* at 16:15-17:25.) Trooper Mills testified that it was "extremely cold" on February 8, 2021, and was "negative 10, negative 9 that whole timeframe" with "five, ten mile an hour wind," which "definitely made it colder." (*Id.* at 18:15-25.)

At approximately 6:30 a.m. on February 8, 2021, Trooper Mills was "on Interstate 90 just east of the City of Aiden," and had "just pulled in to the crossover to run stationary and just monitor traffic," when he "observed a white [Nissan pickup] truck in the right land with -- looked like kind of a utility-type topper with the double doors in the back." (*Id.* 18:1-14; 19:1-6.) The truck had a ladder rack on the top, was in the right lane, and to Trooper Mills, "it looked like it moved more over toward the right shoulder and slowed down in speed as it passed me." (*Id.* at 19:6-9; 25:25-26:2; 86:13-18.) Trooper Mills testified that state troopers watch for "how people react when they see us," and that reaction "caught [his] attention." (*Id.* at 19:10-12.) After the truck drove past Trooper Mills, he "noticed that there was like a five or six digit number on the back lower left, which would be kind of for a fleet vehicle that we see." (*Id.* at 19:12-15.) The vehicle went by and had Wisconsin plates, so he proceeded to follow it. (*Id.* at 19:15-16; 86:19-20.) Trooper Mills followed the truck because he did not see any "US DOT number on the side, or any company magnetic decal or anything," the vehicle "looked fairly new," but seemed clean notwithstanding "the salt and stuff on the road," and "looked like a fleet vehicle but it didn't have any commercial markings on it." (*Id.* at 19:17-24; 85:25-86:6, 86:21-87:3.) Trooper Mills, driving an unmarked gray Tahoe, caught up to the truck on the left and observed that the speed of the truck was fluctuating

6

between 45 and 50 miles an hour in a 70-miles-per-hour zone by "car clocking it with [his] speedometer."  (*Id.* at 21:10-21; 86:4-6.)

Trooper Mills followed the truck "until Freeborn or State Highway 13," at which time the driver braked."  (*Id.* at 21:16-17.)  Trooper Mills, who was alongside the truck, could see "at that point" that "the windows were all frosted," causing him to believe the driver had just started driving and had not let his windows clear.  (*Id.* at 21:17-20; 85:25-86:9.)  In particular, he testified there was "maybe a little bit by the mirror where it was, like, not frosted, but otherwise it was completely iced over like they had just started the vehicle and I could just see a driver silhouette," but not into the vehicle.  (*Id.* at 23:18-24:1.)  Trooper Mills testified that the frosted state of the windows violated Minnesota Statutes § 169.71(3).  (*Id.* at 23:22-24:6.)

Trooper Mills ran the registration of the truck, which "[c]ame back to a private party out of Madison, Wisconsin."  (*Id.* at 22:13-14.)  This raised his suspicion that the vehicle was not a commercial vehicle because "it didn't come back to an LLC or a company," which "contradicted having a six digit vehicle number stuck on the back of the truck with no company name, US DOT numbers."  (*Id.* at 22:14-17, 23:11-15.)  Trooper Mills initiated a traffic stop based on the driving behavior and uncleared windows at around 6:34 a.m., and the vehicles came to rest in milepost 155 in Freeborn County about 8-10 minutes west of Albert Lea.  (*Id.* at 22:18-20; 24:7-13; 26:24-27:6; 47:19-21; 87:11-16.)

Trooper Mills testified that while approaching the truck, "the first thing [he] noticed was the two traffic cones directly in the back," which "were right in front of the

rear windows," and "looked fairly new." (*Id.* at 31:19-25.) He then "looked into the truck bed and [] didn't see anything as far as equipment, luggage." (*Id.* at 31:25-32:2.) This was noteworthy to Trooper Mills because fleet-type vehicles with ladders usually "have a topper" and "there's going to be more contents than just two traffic cones." (*Id.* at 32:3-7.) Moreover, he found the way the two traffic cones were placed in the truck noteworthy, because they were in "front of the window visible to law enforcement or anybody that's behind them," "specifically placed in front of each window," but usually traffic cones are stacked up all together. (*Id.* at 32:7-12.)

Trooper Mills was unable to see inside the truck when he approached the passenger side window due to the frosted windows. (*Id.* at 32:25-33:9.) Trooper Mills testified that when he approached the vehicle, his body microphone audio, which is wireless and syncs with the camera system in his squad car, was not working and so his interactions with the driver when he approached the truck were not recorded. (*Id.* at 33:10-34:7; 84:14-85:3.) The video recording from Trooper Mills' squad car picked up audio only from inside the vehicle. (*Id.* at 34:4-17; 84:20-25.)

Upon approaching the truck, Trooper Mills identified himself, informed the driver that he stopped him due to the frosted windows, and asked the driver for his driver's license and vehicle registration. (*Id.* at 31:7-11; 34:18-25; 87:17-20.) The driver opened the door, informed Trooper Mills that the defrost was not working, and provided Trooper Mills with a Wisconsin registration card, a Wisconsin identification paper card that was not a driver's license, and an Illinois' driver's license which Trooper Mills thereafter discovered was valid. (*Id.* at 31:11-15; 35:1-18.) The papers identified the driver as

Grajeda Sanchez.  (*Id.* at 35:9-36:14.)  Grajeda Sanchez informed Trooper Mills that he had moved to Wisconsin a month prior but did not have a Wisconsin driver's license because he failed his Wisconsin test.  (*Id.* at 35:13-18.)  Trooper Mills inquired as to Grajeda Sanchez's travel, and he informed Trooper Mills that he was driving from "Soy Falls," which Trooper Mills then confirmed meant Sioux Falls.  (*Id.* at 36:19-37.)  Trooper Mills asked Grajeda Sanchez "what he was doing," and he responded that he did contract "cable work, installation work," and after hesitating, stated that he did such work for AT&T.  (*Id.* at 37:2-7.)  Trooper Mills asked Grajeda Sanchez why "everything" was in his truck cabin instead of his truck bed, and in response, he "just was pretty vague and said, 'Everything is in here'" without further explanation.  (*Id.* at 40:9-13.)  Grajeda Sanchez stated that he had made a stop in a hotel in Laverne, Minnesota, which Trooper Mills "thought was odd being he's doing work in Sioux Falls and that's all where the majority of hotels are.  Laverne is kind of out the way."  (*Id.* at 40:5-41:8.)  Trooper Mills "thought he was probably coming from further away than Sioux Falls just based on that it didn't make a lot of sense that he would stop in Laverne if he was truly visiting Sioux Falls with all the hotels" and had "some amount of suspicion" as a result.  (*Id.* at 41:5-10.)

When Grajeda Sanchez opened the door during this initial approach, Trooper Mills noticed "three brand new reflective traffic safety orange and green vests [] on three of the seats," which was noteworthy to him because "it appeared like it was staged for us to see, for law enforcement," including because Grajeda Sanchez was "by himself" but had three reflective vests that had no dirt and "looked brand new."  (*Id.* at 37:15-38:2.)  There were

also "two short-sleeved polo shirts that were white that were hanging directly in front of the driver's side and passenger side rear windows, visible," which Trooper Mills testified "seemed odd" in view of "the temperature and the weather during that time," there was no winter clothing in the vehicle, and because the polos did not have any business names on them. (*Id.* 38:3-12; 95:8-13.) Trooper Mills testified that Grajeda Sanchez had a "lanyard around his neck," which was "visible, but it looked like a credit card or something" and did not have "a photo or a picture with a business on it." (*Id.* at 38:13-15.) He did not see any "paperwork [or] anything related to installation or receipts." (*Id.* at 38:18-19.) Trooper Mills testified that at this point, based on the appearance of the vehicle and his interaction with Grajeda Sanchez, he suspected that the truck "was kind of a staged vehicle that wasn't actually a commercial vehicle, especially with the paperwork he had provided." (*Id.* at 37:8-14.)

Trooper Mills made other observations during his initial approach, including one box of cable that was on top of an older box in the cab, as well as a cooler on the front floor, a bag and box of tools in the back, a bag of orange rags that had a brand new tag on it, but nothing "seemed really scratched up or used," and "[i]t looked like it was all just placed there." (*Id.* 38:20-39:19.) He also smelled "kind of a really strong odor of what [he] would say like laundry detergent smell or like -- it wasn't so much because there was a couple of -- some air fresheners that you could see visible, but [he] believe[d] they [were] the new car smell, and it didn't smell like that." (*Id.* at 39:20-40:1.) Instead, "[i]t smelled like laundry detergent" which at that point, coupled with his other observations,

Trooper Mills "assum[ed] it could be a masking odor to try to cover up contraband odor." (*Id.* at 40:1-4.)

After his initial approach of the truck, which lasted three to four minutes, as Trooper Mills was returning to his squad car, he "shine[d his] light, look[ed] underneath the truck bed, because [he] was suspecting that it might have a false truck bed with everything [he] was seeing" as he was "pretty sure this was going to be a trafficking vehicle just based on [his] prior stops that [he has] had." (*Id.* at 41:9-42:15.)

Trooper Mills reapproached the driver's side of the truck to confirm the order of Grajeda Sanchez's name given that a search of his Illinois driver's license did not provide any results. (*Id.* at 42:22-43:8.) At this point, Trooper Mills noticed that Grajeda Sanchez's eyes were bloodshot with a glassy appearance, which he thought was possibly due to fatigue as he "thought might have been a sign that he's been driving longer than from Laverne," or due to drug use. (*Id.* at 43:9-22; 47:3-5.) After returning to his squad car, Trooper Mills entered the driver's name and license plate number of the truck and had dispatch check the El Paso Intelligence Center ("EPIC")[5], which showed Grajeda Sanchez as having a valid Illinois driver's license and showed the truck as being registered in Grajeda Sanchez's name on "January 13th" in Wisconsin with an accompanying Madison address. (*Id.* at 45:2-21.) EPIC also showed the "expiration on the original plate was the end of December," so Trooper Mills thought it "would be weird

---

[5]    EPIC "is the analyst support for law enforcement nationwide. They track active cases, border crossings. [Law enforcement] utilize[s] it quite a bit on the interstate with license plate readers, but it helps -- it's an investigative tool that [law enforcement] can get data from, so it's like a federal analytical support." (Dkt. 43 at 44:6-18.)

that [Grajeda Sanchez] would still have an old Wisconsin plate to reregister" given that he had said that he only lived in Wisconsin for a month and, based on his experience, the license plate stays with the owner and can be reregistered with a different vehicle.  (*Id.* at 45:10-22.)  However, "the plate did look new."  (*Id.* at 45:21-22.)  Trooper Mills testified that typically drug traffickers changed license plates depending on where in the country the driver is to lessen the suspicions of law enforcement, and for instance, in Minnesota, law enforcement "see[s] a lot of Wisconsin [plates] so [the drug traffickers] blend in versus an Illinois plate that [law enforcement] might not see as often."  (*Id.* at 45:22-46:15.)

Trooper Mills testified that after "all of that and everything [he] saw in the car, especially with the registration, [the driver's] license, [he] believed it was a trafficking vehicle," and "didn't believe that [Grajeda Sanchez] was coming from Sioux Falls."  (*Id.* at 46:16-23; 47:6-13.)  Trooper Mills "figured he was coming from, you know, more of a source, we call them, area[s] such as California or Arizona," and testified that drug traffickers "always pick that larger city to tell us because it's less suspicious when they are giving us a story."  (*Id.* at 46:23-47:2.)  Additionally, given the "fatigue and bloodshot eyes that" Trooper Mills saw, he "thought [it] might have been a sign that [Grajeda Sanchez had] been driving a lot longer than from Laverne."  (*Id.* at 47:3-13.)

Trooper Mills then created a warning ticket at 6:48 a.m., which was printed around 6:53 a.m., and stated that prior to initiating the ticket, for purposes of his law enforcement duties, he had formed the decision to the search the truck because he believed Grajeda Sanchez was "hauling -- that it was a trafficking vehicle."  (*Id.* at 47:22-48:15; 87:21-23;

88:2-23.)  While creating the warning ticket, Trooper Mills "sent a message to Trooper [Jacob] Ruppert, because he was the closest [and was 'the canine handler on the job at that time'], to start getting backup there, being that [he] was by [him]self, before [he] got further into the vehicle stop and the search."  (*Id.* at 48:16:20; 90:2-14.)  After making the warning ticket but prior to printing it, dispatch informed Trooper Mills that Grajeda Sanchez had a query from law enforcement in 2013 and had two or three active drug investigations in Michigan and Illinois.[6]  (*Id.* at 48:21-49:2.)

Trooper Mills testified that after printing the warning ticket and while still in his squad car, because he had not gotten a response from Trooper Mills, he radioed dispatch to contact Trooper Ruppert and was informed he was enroute to join Trooper Mills.  (*Id.* at 49:19-50:3; 90:2-8.)  For purposes of the traffic stop, Trooper Mills stated that he was going to issue the warning; perform a field sobriety test to ensure Grajeda Sanchez was "okay to be driving based on the lane use and [] what [he] saw in his eyes" using the horizontal gaze nystagmus ("HGN") test, by checking his mouth for any recent signs of drug use; and checking his pulse; and then his "intention was to ask consent to search [the truck] at the conclusion [of the stop]."  (*Id.* at 50:4-51:12; 98:13-99:9.)  Trooper Mills had no intention of "letting" Grajeda Sanchez leave before the canine arrived.  (*Id.* at 90:15-18.)

---

[6]    There was also "an LPR read" (license plate reader) from Pennsylvania, but Trooper Mills did not include it in his report because he was unsure if it was actually Grajeda Sanchez's vehicle.  (*Id.* at -49:2-10.)

About 25 minutes into the stop, Trooper Mills returned to the truck, Grajeda Sanchez exited the truck on Trooper Mills' request, and they went to the back of the truck where Trooper Mills patted Grajeda Sanchez down for weapons and conducted the HGN test. (*Id.* at 51:13-52:4; 88:24-89:1.) Before handing Grajeda Sanchez the warning ticket and returning "his paperwork," Trooper Mills checked Grajeda Sanchez's eyes, which were bloodshot but had normal-sized pupils with no nystagmus present. (*Id.* at 53:15-54:18.) On examination, Grajeda Sanchez's mouth did not have any heat bumps or signs of drug use and his radial pulse was 120 beats per minute. (*Id.* at 54:2-9.) Grajeda Sanchez said he was "cold and nervous." (*Id.* at 52:6-7.) Trooper Mills described Grajeda Sanchez's behavior at this point as "cooperative and polite[.]" (*Id.* at 53:3-10.)

Trooper Mills testified that based on his suspicions that the truck was a trafficking vehicle, after he handed Grajeda Sanchez the warning ticket and his paperwork, he "wanted to get a few more clarifying questions as far as the business and where [Grajeda Sanchez] did the work that he claimed in Sioux Falls" "just to either confirm [his] suspicions or eliminate them." (*Id.* at 54:20-55:9; 89:5-9.) As such, Trooper Mills asked Grajeda Sanchez how many vehicles/trucks he had, to which Grajeda Sanchez responded two, which Trooper Mills testified "contradicted the large fleet number that was on the vehicle." (*Id.* at 55:10-14.) Trooper Mills also asked if Grajeda Sanchez had invoices or paperwork from the contracted work he did in Sioux Falls, to which he responded that he "left all that in his other truck"; moreover, Grajeda Sanchez could not provide any address for where he performed the work in Sioux Falls or describe the work. (*Id.* at 55:15-20.) Trooper Mills asked Grajeda Sanchez if he had any prior drug arrests, to

14

which he responded "Not here," after which Trooper Mills asked "'Well, anywhere?'" and Grajeda Sanchez responded "'Cocaine in Wisconsin.'"  (*Id.* at 56:18-20.)

Trooper Mills testified that from the start of the traffic stop, "every next step" he took "completely supported [his] initial assumptions [and suspicions which] were that it was a trafficking vehicle."  (*Id.* at 55:21-56:20.)  Trooper Mills stated that at this point, Grajeda Sanchez did not provide any more answers to his questions, and "at that point he just kind of seemed more deflated, like he didn't have anymore [sic] answers to them, and just kind of assumed that the gig was up and we're going to, you know, search his vehicle."  (*Id.* 56:21-24.)

Trooper Mills testified that he then explained to Grajeda Sanchez that he conducts drug interdictions and explained "some things that [he had] seen that look[ed] suspicious," and asked if he had "any drugs in the vehicle, any large amounts of U.S. currency," to which Grajeda Sanchez responded "[n]o."  (*Id.* at 56:24-58:1.) Trooper Mills stated that he then asked Grajeda Sanchez "[c]an I search your vehicle?" and he responded "[g]o ahead.".  (*Id.* at 58:2-8; 91:5-25.)  Given his training and experience, Trooper Mills was not surprised that Grajeda Sanchez consented to a search because "[m]ost of the time when it's a pretty good compartment, . . . they're pretty confident that [troopers would] not [] find it so they just want to cooperate and get going as quickly as possible" without "draw[ing] anymore suspicion to them, versus ones where it's just in the trunk or where we're obviously going to find it more quickly, they are more apt to not consent."  (*Id.* at 81:10-82:3.)  Trooper Mills stated that he asked Grajeda Sanchez if he wanted to stand outside or sit in his squad car during the search due to the temperature,

15

that he "requested to" sit in Trooper Mill's squad, and that he escorted Grajeda Sanchez back to his squad car, where he sat in the back seat on the passenger's side (which has no door handles). (*Id.* at 58:19-59:17; 60:3-9; 61:5-9; 99:22-100:2.) Trooper Mills testified that Trooper Ruppert had arrived before he asked Grajeda Sanchez for consent, but that he told Trooper Ruppert "to just stand back by my vehicle because I didn't want both of us around him for the consent, just to make sure it's valid." (*Id.* at 59:21-60:2; 90:19-91:25.)

Trooper Mills testified that due to the temperature, he provided Trooper Ruppert with some, but not all, of the information he had learned over the course of the stop, giving Trooper Ruppert enough reasonable suspicion for him to deploy his dog, Canine Rocco. (*Id.* at 61:15-21.) Trooper Mills testified that he wanted to conduct a canine sniff even though he had consent because he wanted to "kind of speed up the spot, too, to help us pinpoint where [the] odor is at, and also to get probable cause to support what we have already said with the dog alert." (*Id.* at 62:2-7.) He testified that he told Trooper Ruppert that the driver of the truck consented to a search. (*Id.* at 61:22-24.)

Trooper Mills then informed Grajeda Sanchez that they were going to utilize the dog, but Grajeda Sanchez did not withdraw his consent at this point. (*Id.* at 62:13-24.) After Trooper Mills turned off the vehicle "so the exhaust [wa]sn't in the dog's nose," Trooper Ruppert and Canine Rocco then "did the sniff" by going around the exterior of the vehicle three times with no alert or indication received. (*Id.* at 62:18-63:11; 93:12-94:5.) Trooper Mills testified that he "selected and trained Rocco and Trooper Ruppert,"

and "get[s] together monthly two days a month" with them, making him familiar with Canine Rocco as it relates to his alert on a controlled substance.  (*Id.* at 71:15-23.)

After that initial sniff was performed, Troopers Mills and Ruppert conducted a "hand search of the vehicle" to look for drugs.  (*Id.* at 63:12-17; 94:6-11.)  Trooper Mills testified that he asked Grajeda Sanchez if the back was unlocked given that "he was consenting, so I usually try to keep throughout the stop, is just ask them various times to, you know, that they are still consenting; gives them an opportunity to withdraw the consent" and in case a key was needed to access certain areas.  (*Id.* at 63:22-64:7.) Grajeda Sanchez informed Trooper Mills that the back was unlocked and Trooper Mills and Ruppert then hand-searched the truck.  (*Id.* at 64:8-14.)  During this search, Trooper Mills noticed "a Styrofoam cooler that was directly in the seam of the back two doors that had some type of frozen meat," which at that point caused Trooper Mills to think the cooler with meat was "there to distract the dogs."  (*Id.* at 64:15-21.)  Trooper Mills observed "a bungee strap that ran across both sides of the truck bed that held those two traffic cones secure against those windows" so they would not move.  (*Id.* at 64:22-24.)

Trooper Mills then searched the passenger compartment which had a jack, bigger sockets, "nothing was associated with wire or cable other than the box of cables," and air fresheners in the door pockets and on the bottom side of the seats that were "strategically placed throughout the vehicle in non-common areas."  (*Id.* at 64:22-65:4, 16-25; 66:21-67:4.)  Trooper Mills testified that he "located a bag, plastic bag, that had 20, 30 bars of soap and that's where that fragrant -- that strong laundry detergent smell came from, and that was just sitting on the [rear] floor [directly behind the front passenger seat]" and "at

that point [he] suspected that was just a distraction, masking odor is why that was placed there." (*Id.* at 65:4-15; 66:18-20.) Trooper Mills stated that the tools, including the sockets, found in the vehicle "seemed more related to removing larger bolts versus doing electrical work or cable work" and that there was no luggage, business documentation, or anything in the truck. (*Id.* at 66:1-17.)

Trooper Mills then asked Grajeda Sanchez for access, that is, a key "to that side compartment" because they were unable to open it and he "advised that any key would open it [you can use the ignition key]; and then we later figured out that it was just froze shut." (*Id.* at 67:10-23.) Trooper Mills stated that at this time, Grajeda Sanchez gave no indication that he wanted to withdraw consent. (*Id.* at 67:24-68:1.) Trooper Mills testified that around 7:10 a.m., Sergeant Doug Rauenhorst joined him and Trooper Ruppert to continue the search. (*Id.* at 68:2-8, 94:12-14.) Sergeant Rauenhorst brought a "snap-on scope" with him, which is a "very thin camera with a light on the end of it" to use in accessing the topper and back portion of the truck. (*Id.* at 68:2-8; 94:12-95:7.)

Trooper Ruppert redeployed Canine Rocco about 45 minutes into the stop to do a sniff of the interior of the truck given the troopers' inability to find any drugs through a hand search, and because based "on everything" they had observed, they "believed it was going to be buried somewhere deeper in the vehicle." (*Id.* at 68:7-22; 95:14-22.) Canine Rocco sniffed the rear truck bed area, the passenger compartment, and then the engine, including the firewall. (*Id.* at 68:23-70:4; 96:3-9.) According to Trooper Mills, Canine Rocco did not alert when sniffing the back of the truck bed but provided an alert when sniffing the "dash area on the passenger side." (*Id.* at 70:1-12.) Trooper Mills and

Sergeant Rauenhorst were at the front of the truck when Rocco sniffed the engine compartment and Trooper Mills testified that Canine Rocco alerted on the engine area by the firewall.  (*Id.* at 71:18-72:6.)  There is no audio regarding any conversation between the troopers that Canine Rocco indicated during the interior sniff or that he alerted to the dash area, but Trooper Mills and Sergeant Rauenhorst observed his alert of the engine and Trooper Mills "was under the assumption" he alerted to the dash area based on what he observed in the engine compartment.  (*Id.* at 70:22-71:2; 72:2-16; 96:10-97:3; 100:3-101:7.)  Trooper Mills stated that Canine Rocco was "air scenting," "alerting frantically on the engine area and firewall," but did not "pinpoint or go to final -- what we call an indication of when he sits."  (*Id.* at 72:5-15.)  Trooper Mills testified: "Some of that might be the surface, too, being that he is on an engine."  (*Id.* at 72:15-16.)  According to Trooper Mills, Canine Rocco's alerts helped with narrowing down the area to focus on and search, leading Trooper Mills to think contraband might be in the dash.  (*Id.* at 72:17-73:2.)  Grajeda Sanchez was never told he was under arrest during the roadside searches.  (*Id.* at 99:18-21.)

Trooper Mills testified that Sergeant Rauenhorst then "talked to" Grajeda Sanchez to "see if he would follow" the troopers to the Department of Transportation garage in Albert Lea, Minnesota ("DOT Garage") that was 10 minutes away from where the stop occurred.  (*Id.* at 73:3-8; 73:24-74:6; 75:9-18.)  Trooper Mills was "nearby" when Sergeant Rauenhorst made this request.  (*Id.* at 74:7-8.)  Sergeant Rauenhorst made this request so that they "could get out of the cold weather and have some access to tools and a hoist to lift up the vehicle if [they] need[ed] to" in order for them to conduct "a

thorough search" given the tools they observed in the truck, Canine Rocco's alerts, and due to safety concerns given that they were on the roadside.  (*Id.* at 73:3-16.)

Trooper Mills testified that Grajeda Sanchez "didn't have a problem with" taking the truck to the DOT Garage and that he "also offered to open up the locked side compartment for us."  (*Id.* at 74:9-12.)  At the time, according to Trooper Mills, Grajeda Sanchez did not give any indication to withdraw consent and Trooper Mills testified that even if he had withdrawn consent, given the troopers' observations and what they had learned, he would not have "let the vehicle go" because they "had probable cause that there was drugs in the vehicle or contraband."  (*Id.* at 74:15-75:5.)

Grajeda Sanchez drove the truck to the DOT Garage, Sergeant Rauenhorst drove in front of the truck, and Troopers Mills and Ruppert drove behind the truck.  (*Id.* at 75:6-10; 77:5-8.)  Troopers Mills testified that he had contacted the Drug Enforcement Administration agent assigned to one of Grajeda Sanchez's ongoing cases in Illinois and that the agent called him back on his drive to the DOT Garage and informed Trooper Mills that "they were working on an investigation where" Grajeda Sanchez "works for a drug trafficking organization and launders or traffics money and drugs in hidden compartments and utilizes a front of, like, cable trucks," which "pretty much confirmed what [the troopers] had already suspected."  (*Id.* at 75:19-76:6.)  Trooper Mills stated that as such, his "goal" was to locate contraband or drugs in the truck.  (*Id.* at 76:7-12.)

Once the truck was at the DOT Garage, Sergeant Rauenhorst "offered" Grajeda Sanchez to go "to a gas station or sit in the [squad car] and stay until the search was done," and Gajeda Sanchez said he would stay in the squad car.  (*Id.* at 76:16- 77:3.)  At

20

the DOT Garage, the troopers removed all items from the truck and Sergeant Rauenhorst "grabbed his dog [Canine Felix] to run it once [they] were in a warmer environment," at which time Canine Felix "alerted to similar areas." (*Id.* at 77:9-14, 161:17-19.) The troopers then conducted a hand search of the truck, during which Trooper Mills "felt a box in the passenger side seat, a metal box that [he] believed was the hidden compartment." (*Id.* at 77:15-17.) There was "a pressure switch on the driver's side of the seat that you would push; and then there was two trunk latches that held that plastic backing of the seat to open up to conceal the compartment," which "contained U.S. currency, two bundles," totaling approximately $13,000. (*Id.* at 77:24-78:13.) The troopers learned about the pressure switch from Grajeda Sanchez, who they talked to about accessing it so as not to destroy the compartment. (*Id.* at 102:21-103:8.) The bag of bars of soap had been located directly behind the passenger side seat. (*Id.* at 65:4-15.)

The troopers also located "a second compartment that was built out into the firewall," which was accessible "through an actuator where the airbag cover is on the passenger side" and "contained 10 kilos of cocaine that [they] Nik tested positive." (*Id.* at 78:22-79:7.) They located this compartment after identifying "non-factory welding mud work" when they lifted the firewall on the engine compartment, which caused them to flip down the glove box, where they saw "non-factory wires running to the area," as well as "some carpeting on the bottom side where your passenger's feet would be," which they peeled back to reveal "plastic wrapped packages with . . . a white substance." (*Id.* at 79:8-24.) The troopers could not determine how to access the compartment, and Grajeda Sanchez did not provide them with the information, so they cut the wires leading

21

to the compartment and were able to remove the airbag cover to access the compartment after supplying power. (*Id.* at 79:25-80:13.) Due to this modification, the air vents had been "cut so there was no air coming out of the defrost vents, so -- which would explain why the side windows were all frosted up." (*Id.* at 81:4-9.) Given his training and experience, Trooper Mills was not surprised that Grajeda Sanchez consented to the search given that "it's a pretty good compartment." (*Id.* at 81:12-82:3.) It took the troopers over 30 minutes to locate the U.S. currency and drugs. (*Id.* 85:4-14.)

**B.    Testimony of Trooper Jacob Ruppert**

At the hearing, Trooper Ruppert testified that he has been in law enforcement for about 16 years, has been working as a trooper for the Minnesota State Patrol for approximately six years, and has been in the position of trooper with a canine since 2018. (*Id.* at 107:2-18; 108:7-15.) Prior to joining the Minnesota State Patrol, Trooper Ruppert conducted routine traffic stops within the jurisdiction of Interstate 90 for about ten years while with the Martin County Sherriff's Office, some of which led to further investigation. (*Id.* at 108:20-109:1.) Trooper Ruppert was involved with drug investigations hundreds of times prior to joining the Minnesota State Patrol. (*Id.* at 109:2-5.) Trooper Ruppert and Canine Rocco have been partners since May 2018 and he had worked with Canine Rocco for about two and a half years as of February 2021. (*Id.* at 107:19-108:6.) Trooper Ruppert and Canine Rocco were certified through the North American police Work Dog Association in 2018 and annually thereafter. (*Id.* at 109:6-19.) Trooper Ruppert and Canine Rocco train for a minimum of 16 hours a month, and trained for around 20 hours a month in the first two years. (*Id.* 109:22-110:9.) Trooper

Ruppert generally deploys his canine about 50 times a year; he makes about 600 to 750 traffic stops per year; he deploys his canine about 40 times per year for traffic stops; and he testified that in general, canines are deployed 5% of the time during traffic stops (although he deploys Canine Rocco less).  (*Id.* at 140:13-24.)

According to Trooper Ruppert, an "alert is when the dog changes breathing or changes pattern and . . . focuses on a particular area" and an "indication would be [] his trained response to then sit."  (*Id.* at 110:10-25; 111:18-112:10.)  Canine Rocco's indication is to sit, he is trained to detect controlled substances, including cocaine, crack, heroin, marijuana, mushrooms, ecstasy, and methamphetamine, and when he alerts, "he's saying that he smells the odor but just can't quite pinpoint where it's coming from."  (*Id.* at 110:19-20; 111:1-17.)

Trooper Ruppert testified that at around 6:45 a.m. on February 8, 2021, he was about three or four miles from Trooper Mills in a direction towards Albert Lea, when he was notified about a traffic stop Trooper Mills was conducting and informed to "go back him up."  (*Id.* at 112:11-113:13.)  At this time, Trooper Ruppert was under the impression that he would be conducting a canine sniff.  (*Id.* at 130:1-12.)  When Trooper Ruppert arrived at the traffic stop, he parked his squad car behind Trooper Mills' vehicle and waited a "few minutes" in his vehicle before then meeting Trooper Mills who informed him "about some of the things he was seeing" and asked Trooper Ruppert to deploy his canine to sniff the exterior of the truck.  (*Id.* at 113:16-114:7.)  Trooper Ruppert then deployed Canine Rocco, who sniffed the exterior of the truck with no alert or indication. (*Id.* at 114:8-115:12; 131:11-14.)  Trooper Ruppert testified that after he informed

Trooper Mills that Canine Rocco did not alert or indicate, Trooper Mills informed him that "based on the consent I have to search the vehicle, we'll start searching it by hand." (*Id.* at 115:11-16; 131:15-17.)  Trooper Ruppert then returned Canine Rocco to his squad car and the troopers began searching the truck by hand.  (*Id.* at 115:17-116:2; 131:18-24.) Trooper Ruppert stated that during the search, the troopers "were certain that there was contraband hidden in [the truck] some place" and so he used a "camera" to look in areas he was unable to see with just his eyes in the bed of the truck.  (*Id.* at 131:25-132:19; 138:4-139:2.)

Trooper Ruppert testified that during the hand search, he observed two brand new cones in the bed of the truck and exclaimed "Wow, this baby is clean" because the bed was spotless.  (*Id.* at 116:11-14.)  This was noteworthy to him because it was a work truck, which "normally . . . do not get cleaned often" and because the cones "positioned in the back of the window" were "brand spanking new."  (*Id.* at 116:3-117:2.)  The cones were noteworthy because "normally cones are stacked in one single pile; but just, yeah, I mean, initially it doesn't catch your attention until you open the back, and that's like the only things in there," along with the cooler.  (*Id.* at 117:3-8.)  The cooler was Styrofoam and had raw meat and ice in it, making it "awfully suspicious because normally if you're on a road trip you have a loaf of bread or you have lunch meat or something like that in there.  Not just raw meat."  (*Id.* at 117:9-19; 132:20-133:1.)  Trooper Ruppert testified that based on his training and experience, the cooler was placed there to "more than likely draw the attention away -- have a canine dog, to draw their attention away from actually

sniffing the vehicle" and was used as "a means of distracting a police canine from smelling the drugs that were in the vehicle." (*Id.* at 117:20-118:3.)

While hand-searching the truck, Trooper Ruppert also observed two brand new orange reflective vests over the passenger seats, which was noteworthy to him given that they did not have stains on them and given where they were placed, he thought they looked "staged." (*Id.* at 118:7-21.) Trooper Ruppert also thought the truck was staged because the tools in the truck did not "match[] the type of work," in particular because the vehicle was staged as a cable install, and had a "roll of, like, a coil of coax cable . . . but the tools in there didn't appear to really match that of a cable install guy." (*Id.* at 118:19-119:19.) Trooper Ruppert has never installed cables. (*Id.* at 133:5-11.) Given what the troopers had observed, at around 45 minutes into the stop, the decision was made for Trooper Ruppert to redeploy Canine Rocco. (*Id.* 120:10-17.)

Canine Rocco was deployed a second time to sniff the inside of the truck, at which time he "shove[d] his nose up under the dash and change[d] his breathing." (*Id.* at 120:18-121:10.) Canine Rocco then backed out right away, and Trooper Ruppert thought he was trying to go under the door, leading him to tell Trooper Mills to check a McDonald's bag that was under the passenger-side dash. (*Id.* at 121:11-17; 133:19-134:16.) Trooper Ruppert did not verbalize that Canine Rocco alerted under the dash. (*Id.* at 134:17-19.)

Canine Rocco then "jumped" on the engine compartment and sniffed around it "and then back and forth on the hood liner," which Trooper Ruppert read as an alert but not an indication. (*Id.* at 122:6-123:3; 134:20-22.) Trooper Ruppert thought "[p]art of

the reasons why [Canine Rocco] probably did not go into an indication is because of the awkwardness of standing on the engine itself," and instead alerted by "increasing his breathing and being focused in on certain areas." (*Id.* at 123:3-11.) Trooper Ruppert testified that the odor Canine Rocco was alerting to "would have been directly, like parallel to or adjacent to where his alert was under the dash," because "the reaction was kind of on the firewall, . . . around the engine and then on to [] underneath the hood." (*Id.* at 123:12-22.) Trooper Ruppert stated that he did not verbalize Canine Rocco's alert on the engine block but recalled that Trooper Mills observed the alert on the engine area. (*Id.* at 126:15-127:13; 134:20-135:4.) According to Trooper Ruppert, Trooper Mills "knows Canine Rocco as well as" Trooper Ruppert does. (*Id.* at 127:9-13.) Trooper Ruppert returned Canine Rocco to his squad car and then the troopers searched the truck "for a little while longer," and eventually determined they could not continue the search outside "in the extreme cold and roadside" and because the wind made it "tougher" for Canine Rocco to perform his sniffs and "smell the odor." (*Id.* at 124:1-125:18.)

Trooper Ruppert testified that Grajeda Sanchez then drove the truck to the DOT Garage. (*Id.* at 125:19-25; 127:18-19.) Trooper Ruppert stated that he "hear[d] some conversation" regarding Grajeda Sanchez driving the truck to the DOT Garage but could not "remember exactly who asked him or what exactly was said," and noted that he did not at any point hear Grajeda Sanchez withdraw consent to search the truck. (*Id.* at 126:1-9; 135:5-18.) It took about 10 minutes to drive to the DOT Garage. (*Id.* at 126:10-12.)

Trooper Ruppert testified that at the DOT Garage, they offered to let Grajeda

Sanchez go "somewhere else" during the search and that it was Grajeda Sanchez's

"choice" to sit in the back of Trooper Ruppert's squad car.  (*Id.* at 135:19-136:15;

136:22-137:13.)  Being at the DOT Garage helped facilitate the search given that it was

"a warm environment off of the roadside without the risk of getting hit by a car or

freezing" and there were "some tools there that are utilized to assist with the search."  (*Id.*

at 127:24-128:15.)  According to Trooper Ruppert, if the troopers had conducted the

search on the roadside "long enough," they "would have found the compartments," but

would have risked freezing or being hit by a car.  (*Id.* at 128:16-25.)

## C.    Testimony of Sergeant Douglas Rauenhorst

At the hearing, Sergeant Rauenhorst testified that he has been in law enforcement

for about 31 years and had been with the Minnesota State Patrol for over 26 years.  (*Id.* at

142:13-143:1.)  Sergeant Rauenhorst is the "most senior" interdiction and canine trooper

in the Minnesota State Patrol, has been teaching drug interdiction for about 20 years, has

trained other troopers on the use of canines and staging, and has had various involvement

with drug interdictions relating to "staged vehicles," including commercial vehicles,

fencing truck, and construction vehicles.  (*Id.* at 143:16-147:5; 147:22-148:5.)  The State

Patrol conducts "quite a few" saturation events, which is an event where an area is

saturated with numerous troopers to identify various violations from motor vehicle stops.

(*Id.* at 147:6-21.)  It is more common to deploy canines during saturation events given

that there are more vehicles stopped.  (*Id.* at 172:10-22.)  In order for a trooper to use a

canine, he must be certified with the canine.  (*Id.* at 171:18-24.)  Canine Felix is certified

through the United States Police Canine Association and Sergeant Rauenhorst has been working with him since August 2020. (*Id.* at 161:20-162:4.) Sergeant Rauenhorst did not know if Trooper Mills was certified with Canine Rocco or not, although, he did not think Trooper Mills was so certified. (*Id.* at 171:25-172:9.)

Sergeant Rauenhorst testified that the State Patrol had a saturation event on the morning of February 8, 2021. (*Id.* at 148:6-12; 170:23-171:6.) At around 6:20 a.m., Sergeant Rauenhorst had signed on for duty when he was notified by Trooper Mills to head to Interstate 90 to assist him with a traffic stop. (*Id.* at 148:13-149:9; 171:7-10.) Sergeant Rauenhorst arrived at the traffic stop around 7:00 a.m. with Canine Felix in his squad car and parked his car behind Trooper Ruppert's squad car. (*Id.* at 149:10-150:4.) Sergeant Rauenhorst testified that when he approached the truck, he observed that it looked "staged" given the construction cones in the back that were sitting upright as opposed to being stacked. (*Id.* at 152:12-153:8.) He testified that it was "almost like they wanted them to be seen in the back window of this truck" and "[t]hey weren't thrown in the back." (*Id.* at 153:8-13.) Sergeant Rauenhorst also observed air fresheners in the passenger side door of the truck; construction vests that appeared brand new with no oil, grease, dirt marks, or fingerprints; orange rags in a bag that was sealed and did not look used; a "box with the wire sticking out, and there wasn't any rip holds or anything in it," which also appeared brand new; and two polos "hanging on both sides" with no winter boots or clothes that construction workers would usually use working outdoors given the cold weather. (*Id.* at 153:14-154:22.) Sergeant Rauenhorst stated that there was also a brush tool in the rear of the truck that had a tag on it which informed his belief

28

that the truck was staged given that "everything [was] new" and with "[m]ost construction guys, not everything is going to be new."  (*Id.* at 154:23-155:12.)

Sergeant Rauenhorst stated that he informed Trooper Mills that "[i]t's going to be buried" given the "amount of time to stage up a vehicle like this, not using it, it's obvious to me that it's set up for illegal contraband hauling."  (*Id.* at 155:17-157:4.)  Sergeant Rauenhorst observed that three of the four tires of the truck were missing a lug nut and the tires were new which was noteworthy to him because "large drug loads always have new tires on or newer tires" to avoid breaking down, indicating to him that "somebody was on those wheels lately or recently."  (*Id.* at 156:17-157:16.)  Sergeant Rauenhorst discussed this with Trooper Mills.  (*Id.* at 157:17-19.)  The troopers did not locate any contraband in the truck while performing a physical search of it on Interstate 90.  (*Id.* at 174:11-15.)

Sergeant Rauenhorst testified that Canine Rocco was deployed a second time and that he was "advised of an alert of the front of the vehicle."  (*Id.* at 157:20-158:7; 176:24-178:2.)  Sergeant Rauenhorst stated that in "order to safely and thoroughly search the vehicle," and given the cold temperature, the troopers decided to take the truck to the DOT Garage.  (*Id.* at 158:8-24; 174:16-24.)  Sergeant Rauenhorst asked Grajeda Sanchez to drive the truck "into the shop" "to take a peek underneath"; did not inform Grajeda Sanchez that the drive was to the DOT Garage, that it would be for a thorough search, or how far the drive would take; and did not inform Grajeda Sanchez that he was free to leave at that point or request that he sign a consent form for the search of his vehicle because he had "received information from Sergeant Mills that it was a consent search

and canine alert." (*Id.* at 174:25-176:23.) While Sergeant Rauenhorst could not remember Grajeda Sanchez's exact response, he stated that he "agreed," "consented," exited Trooper Mills' squad car, opened the truck's topper and asked if the troopers wanted to search it. (*Id.* at 158:25-159:12.) Sergeant Rauenhorst interpreted this as the driver "[c]onsenting to a search. He never said no. And asking him to drive it up to the station office, you know, he agreed" and that the driver "actually took it even a step further by saying, [h]ey, here, opening stuff up like searching with us the vehicle." (*Id.* at 159:4-20.) He further testified that even if Grajeda Sanchez had refused consent, based on the troopers' observations and Sergeant Rauenhorst's experience, he would have towed the truck to continue the search at a safe location. (*Id.* at 182:16-183:6.)

When the troopers and the driver arrived at the DOT Garage, Sergeant Rauenhorst drove the truck into the "shop area" and asked Grajeda Sanchez if he wanted "to go to a gas station, and he wanted to stay around," so "he was seated in the rear seat of Trooper Ruppert's squad," which is "where he wanted to be." (*Id.* at 159:21-161:5; 178:3-19.) Grajeda Sanchez was not permitted to stay in the garage during the search given that the Department of Transportation does not allow unauthorized people in the shop, for liability reasons, and for the troopers' safety. (*Id.* at 178:13-19; 181:9-19.) At the DOT Garage, Sergeant Rauenhorst deployed Canine Felix around the truck to assist with narrowing "it down" given that the cold weather and the wind "can affect the dog, the direction of the wind" so Sergeant Rauenhorst "wanted to get him inside with no wind" and to narrow down where the odor was coming from in the truck. (*Id.* at 162:16-24; 169:2-8; 178:20-25.)

30

Canine Felix alerted on multiple areas, including the "rear of the truck, inside the truck, behind the front passenger seat," "under where the dash would be on the passenger side," and "[u]nder towards the center console, sniffing intensely and not wanting to leave that area." (*Id.* at 162:5-11.) He indicated "in that area underneath the front passenger dash, the center console, where he sat and stared" in the way he was "trained to indicate a present odor of drugs." (*Id.* at 179:1-17.) Sergeant Rauenhorst testified being in the DOT Garage helped him locate the "hide" given the warmth, lack of safety concerns, and tools in the DOT Garage, with or without Canine Felix. (*Id.* at 164:7-22.) At the DOT Garage, Sergeant Rauenhorst was able to open the glove box in the truck and felt "black felt carpeting or felt behind it, which is not from a factory," indicating "after-market tampering with the vehicle." (*Id.* at 162:25-164:22.) The contraband found in the dash took "a while" to access given that the troopers did not want to destroy the dash, but Trooper Mills found the wires where the relay was and cut it in accessing the compartment. (*Id.* at 165:20-167:4.) It took the troopers about an hour to find the U.S. currency and drugs in the truck during their search in the DOT Garage. (*Id.* at 170:9-21.)

Sergeant Rauenhorst stated that Trooper Mills informed him that "it's harder on the passenger seat," which was not typical of passenger seats, and so either Sergeant Rauenhorst or Trooper Mills asked Grajeda Sanchez if "he wanted to cooperate because we knew there was one in the back seat." (*Id.* at 164:23-165:19; 179:18-180:9.) While Grajeda Sanchez did tell the troopers the location of the pressure switch for the passenger seat, Sergeant Rauenhorst testified that if he had not, they would have cut it open. (*Id.* at

180:19-24; 181:5-8.)  Neither Sergeant Rauenhorst nor Trooper Mills told Grajeda
Sanchez he was free to leave or have an attorney present.  (*Id.* at 180:12-24.)

Sergeant Rauenhorst testified that in comparison to others, the level of
sophistication associated with the compartments in the truck "was pretty good" and that
"[s]omebody that's good at doing compartments did it in body work to make it look the
way it did."  (*Id.* at 167:16-168:2.)  Sergeant Rauenhorst stated that in his experience, he
was not surprised that Grajeda Sanchez consented to the search in the first instance
because "it was a good hide," "you had to go behind the dash, find the wires," and both
compartments were "good."  (*Id.* at 169:20-170:3.)

Absent any objections at the hearing, the Court admitted into evidence
Government Exhibits 1, 2, 3, 4, 5, 6, 9, 10, and 11 and Defendant's Exhibits 1, 2, 3, and
4.  (Dkt. 43 at 4:16-5:9; 5:14-21.)

## II.    LEGAL STANDARD

The Fourth Amendment guarantees "[t]he right of the people to be secure in their
persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S.
Const. amend. IV.  "The Fourth Amendment prohibits 'unreasonable searches and
seizures' by the Government, and its protections extend to brief investigatory stops of
persons or vehicles that fall short of traditional arrest."  *United States v. Arvizu*, 534 U.S.
266, 273 (2002) (citing *Terry v. Ohio*, 392 U.S. 1, 9, (1968)).  "A traffic stop is a seizure,
so it must be supported by reasonable suspicion or probable cause."  *United States v.
Maurstad*, 35 F.4th 1139, 1143 (8th Cir. 2022) (citing *United States v. Hollins*, 685 F.3d
703, 705-06 (8th Cir. 2012)).  "Any traffic violation, however minor, provides probable

cause for a traffic stop." *Hollins*, 685 F.3d at 706. However, "a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures," and becomes unlawful unless law enforcement has reasonable suspicion to continue the detention. *Rodriguez v. United States*, 575 U.S. 348, 351 (2015).

"[W]arrantless searches are *per se* unreasonable unless they fall under an exception to the warrant requirement." *United States v. Farrington*, 42 F.4th 895, 898 (8th Cir. 2022) (citation omitted). "The automobile exception permits warrantless searches of an automobile and seizures of contraband where there 'is probable cause to believe that an automobile contains contraband.'" *Id.* at 899 (citation omitted). "Such searches may lawfully reach 'places in which there is probable cause to believe that [contraband] may be found,' including containers discovered within the automobile." *Id.* (quoting *California v. Acevedo*, 500 U.S. 565, 579-80 (1991).

"Probable cause exists, when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Keck*, 2 F.4th 1085, 1089 (8th Cir. 2021) (quoting *United States v. Murillo-Salgado*, 854 F.3d 407, 418 (8th Cir. 2017)). "Reasonable suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *United States v. Mosley*, 878 F.3d 246, 251 (8th Cir. 2017) (cleaned up). "An officer must have a reasonable, articulable suspicion that a person is involved in criminal activity unrelated to the traffic violation before the officer may expand the scope of the traffic stop and

continue to detain the person for additional investigation." *United States v. Carrate*, 122 F.3d 666, 668 (8th Cir. 1997).

"In determining whether reasonable suspicion exists, the Court looks to the totality of the circumstances, in light of the officer's experience." *Id.* (cleaned up). "[O]fficers may draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Hurd*, 785 F.3d 311, 314 (8th Cir. 2015) (cleaned up). In addition, courts "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)); *see also Hurd*, 785 F.3d at 314-15.

"A search based on consent may be made by law enforcement officers without a warrant or probable cause, and any evidence discovered during the scope of the search may be seized and admitted at trial." *United States v. Del Real*, No. 1:10CR 52 SNLJ (LMB), 2010 WL 3258608, at *3 (E.D. Mo. July 30, 2010); *see also United States v. Chaidez*, 906 F.2d 377, 381 (8th Cir. 1990) ("Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area."). The prosecution has the burden of proving, by the preponderance of the evidence, that consent to search was freely given. *United States v. White*, 81 F.3d 775, 778 (8th Cir. 1996).

## III.    ANALYSIS

Grajeda Sanchez seeks suppression of evidence obtained as a result of the search of his truck.  He argues that the troopers illegally expanded the scope and duration of the traffic stop without a reasonable, articulable suspicion, lacked probable cause to search the truck, and also that he did not "willingly and knowingly" give consent to the search of his truck.  (Dkt. 49 at 7-15.)  As to any statements, he also argues "as conceded by the government at the motions hearing, Mr. Grajeda Sanchez's un-Mirandized statements inside of the troopers' squad cars should also be suppressed because Mr. Grajeda Sanchez was clearly in-custody in the locked squad car when he was questioned by the officers." (*Id.* at 16.)

The Government responds that from early in the traffic stop, Trooper Mills observed "specific and articulable facts of additional crime in the form of drug trafficking," which provided reasonable suspicion to extend the stop.  (Dkt. 53 at 9-15.) The Government further argues that the troopers developed probable cause to conduct a warrantless search of the truck, and that even if reasonable suspicion or probable cause was not sufficiently developed, the Defendant consented to the search without unnecessary delay.  (*Id.* at 9, 15-21.)

The Court analyzes the parties' arguments below.

A.      **Reasonable Suspicion to Extend the Stop**

Grajeda-Sanchez does not challenge the initial stop based on the frosted windows,[7]

but argues that his Fourth Amendment rights were violated because he was seized beyond

the time reasonably required to issue the warning ticket.  (Dkt. 49 at 8-11.)  In particular,

Grajeda Sanchez argues that the stop should have ended after Trooper Mills checked his

driver's license and registration, verified that he did not have any outstanding warrants,

and wrote up and printed the warning.  (*Id.* at 8-9.)  According to Grajeda Sanchez,

Trooper Mills instead prolonged the stop by performing the HGN test, which Grajeda

Sanchez argues was unnecessary, when he was in fact waiting for Trooper Ruppert to

arrive to conduct a canine sniff.  (*Id.* at 8-11.)

The Government responds that "[w]hile debatable that he extended the stop by any

substantive degree, Trooper Mills had reasonable suspicion to extend the stop longer than

the time required to solely issue a traffic ticket."  (Dkt. 53 at 10.)  The Government also

argues that "the performance of field sobriety tests is within the scope of a traffic stop

and consent is not required."  (*Id.* at 20.)

When conducting a traffic stop, an officer is "entitled to conduct an investigation

'reasonably related in scope to the circumstances which justified the inference in the first

---

[7]      Minnesota law prohibits any person from driving "any motor vehicle with the
windshield or front side windows covered with steam or frost to such an extent as to
prevent proper vision," Minn. Stat. § 169.71, subd. 3, and also provides that "a vehicle
shall be driven as nearly as practicable entirely within a single lane and shall not be
moved from the lane until the driver has first ascertained that the movement can be made
with safety," Minn. Stat. § 169.18, subd.7(1).  "Any traffic violation, however minor,
provides probable cause for a traffic stop."  *Hollins*, 685 F.3d at 706.

place." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001) (citations omitted). The Fourth Amendment intrusion "must be temporary and last no longer than is necessary to effectuate the purpose of the stop and [the] officer should employ the least intrusive means available to dispel the officer's suspicion in a timely fashion." *Id.* (quotations omitted). As such, during the course of a traffic stop, an officer "may request the driver's license and registration, request that the driver step out of the vehicle, request that the driver wait in the patrol car, conduct computer inquires to determine the validity of the license and registration," as well as "conduct computer searches to investigate the driver's criminal history and to determine if the driver has outstanding warrants, and make inquiries as to the motorist's destination and purpose." *Id.*

As stated above, Grajeda Sanchez does not dispute that Trooper Mills' conduct of checking his driver's license and registration, verifying that he did not have any outstanding warrants, and writing up and printing the warning, were within the scope of the traffic stop. *See United States v. McCarty*, 612 F.3d 1020, 1024-25 (8th Cir. 2010) ("During a lawful traffic stop, an officer may conduct a reasonable investigation. A reasonable investigation includes asking the driver for his license and registration, requesting the driver to sit in the patrol car to answer questions, verifying the driver's identification and related documents, and asking questions about the driver's itinerary.") (citations omitted); *see also White*, 81 F.3d at 778 ("We have held that a reasonable investigation during a traffic stop may include asking for the driver's license and registration, requesting the driver to sit in the patrol car, and asking the driver about his destination and purpose. A law enforcement officer may also run a computer check to

establish whether the vehicle has been stolen and to ascertain whether there are outstanding arrest warrants for the occupants of the car.") (cleaned up).  However, Grajeda Sanchez argues that the HGN test was "unnecessary" and was done to "buy time" while Trooper Mills was waiting for Trooper Ruppert to arrive.  (Dkt. 49 at 7-10). The Court therefore addresses whether the HGN test was an impermissible expansion of the scope and duration of the traffic stop.

In *United States v. Rekonen*, the court was faced with the question of whether the defendant's Fourth Amendment rights were violated when officers performed field sobriety tests on him.  Crim. No. 07-123 (JNE/RLE), 2007 WL 2973840, at *15 (D. Minn. Oct. 9, 2007).  While the officer conducting the traffic stop in *Rekonen* did not smell alcohol on the defendant, he observed the defendant's eyes were bloodshot, glassy, and watery, and as a result, performed the field sobriety tests.  *Id.*  The *Rekonen* court found that "[u]nder Minnesota law, which [the officer] was enforcing, a field sobriety test may only be administered after the officer observes sufficient indicia of intoxication to form a reasonable suspicion that the driver was operating his vehicle while intoxicated," and that indicia of intoxication "include[s] bloodshot and watery eyes, an odor of alcohol, slurred speech, and an uncooperative attitude."  *Id.* (noting that the "Minnesota Court of Appeals has held that, 'an officer needs only one objective indication of intoxication to constitute probable cause to believe a person is under the influence") (cleaned up).

At the January 31, 2023 hearing, Trooper Mills testified that when he approached the truck the second time to verify Grajeda Sanchez's name, he approached from the driver's side (rather than the passenger's side), was closer to Grajeda Sanchez, and

noticed that his eyes were bloodshot and glass in appearance, which he thought might be due to fatigue or drug use. (Dkt. 43 at 42:22-43:22.) Trooper Mills testified that due to Grajeda Sanchez's appearance and his lane use, braking, and varying speed, he decided to perform the HGN test to ensure he was "okay to be driving." (*Id.* at 50:9-22; 51:7-12, 98:13-99:9.) Accordingly, given his observations, the Court finds that Trooper Mills lawfully conducted the HGN test which "fell well within the proper ambit of [the] traffic stop." *Rekonen*, 2007 WL 2973840 at *15; *see also United States v. Clark*, Case No. 20-cr-213 (MJD/LIB), 2021 WL 5310995, at *8-9 (D. Minn. Sept. 17, 2021) (finding reasonable suspicion to conduct field sobriety test where driver was pacing, fidgeting, taking deep breaths, rubbing his hands, and requesting a cigarette contrary to law enforcement's direction to stand still and exhibited other signs of impairment).

It was at this point, that is, after Trooper Mills performed the HGN test and provided Grajeda Sanchez with the warning ticket and all other documents, that the legitimate investigative purpose of the traffic stop concluded. *See Jones*, 269 F.3d at 925 (finding that the "legitimate investigative purpose" of the traffic stop was completed after the trooper completed his "initial investigation and determined that [the defendant] was neither tired nor intoxicated, that his license and registration were valid, and that there were no outstanding warrants for his arrest"); *see also White*, 81 F.3d at 778 (finding a traffic stop ended after the officer handed the defendant his license and registration and explained the warning ticket).

The next question is whether law enforcement had a reasonable suspicion that would justify extending the stop after Trooper Mills performed the HGN test and

provided Grajeda Sanchez with the warning ticket and other documents.  Grajeda

Sanchez contends that "'Trooper Mills' testimony falls short of articulating a reasonable

suspicion, at the appropriate time, for prolonging Mr. Grajeda Sanchez's traffic stop" and

also challenges the continuation of the search at the DOT Garage "when the troopers

were unable to locate evidence of controlled substances in their roadside search," which

continued the search "approximately one hour and five minutes after Mr. Grajeda

Sanchez was initially stopped."  (Dkt. 49 at 10-11.)  The Government responds that

"Trooper Mills made numerous observations early in the traffic stop–observations

supporting a reasonable suspicion that the defendant was transporting illegal drugs" and

that justified extending the stop "longer than the time required to solely issue a traffic

ticket."  (Dkt. 53 at 9-11.)

Here, the totality of the circumstances shows that Trooper Mills had reasonable

suspicion of drug trafficking activity that warranted extending the traffic stop and

conducting the roadside search.  At the hearing, Trooper Mills testified that when the

truck passed him, he observed that it was a utility-type topper with double doors in the

back and a ladder rack; had what appeared to be a 5-or 6-digit fleet vehicle number on it,

but no US DOT number or magnetic decal; was fairly new and clean despite the salt and

other "stuff on the road"; "looked like a fleet vehicle but didn't have any commercial

markings on it;" and it moved "more over toward the right shoulder" and slowed down

when it passed him.  (Dkt. 43 at 19:4-24.).  This raised his suspicion because on Interstate

90, the State Patrol "get[s] a lot of larger vehicles because it's mostly a lot of marijuana

that gets hauled in from the west coast across" and while they have found "sprinter vans,

stuff like that," drug traffickers tried to use larger vehicles because marijuana is bulky. (*Id.* at 19:25-20:21.)

While following the truck, Trooper Mills ran the registration and determined that the truck was registered to a private party, which raised his suspicion that it was not actually a commercial vehicle. (*Id.* at 22:13-23:15.) On his initial approach, Trooper Mills observed two traffic cones in the back that looked fairly new; the truck had Wisconsin license plates; and he did not see any equipment or luggage in the truck bed, which was unusual for a "fleet-type vehicle with a ladder" and a topper. (*Id.* at 31:19-32:7.) He testified that typically traffic cones are stacked, but the cones were "specifically placed in front of each window" and "visible to law enforcement or anybody that's behind" the truck. (*Id.* at 32:3-12.) Grajeda Sanchez provided Trooper Mills with a Wisconsin registration card and identification paper as well as an Illinois driver's license; hesitated before stating the name of the company he said he was performing contract work for; and informed Trooper Mills that he was driving from "Soy Falls" and had made a stop at a hotel in Laverne, Minnesota. (*Id.* at 35:11-18; 36:19-37:14; 40:5-41:8; 45:17-46:15.) Trooper Mills found this odd given that there are numerous hotels in Sioux Falls and testified that at this point, he had "some amount of suspicion" because Laverne was "kind of out of the way" and because in his experience, drug traffickers typically say they are coming from a big city (such as Albert Lea, Sioux Falls, or Des Moines) "because it's easy to remember." (*Id.* at 40:16-41:10.) He thought Grajeda Sanchez had come from farther away than Sioux Falls, from a source state such as California or Arizona, if he had stayed in a Laverne hotel. (*Id.* at 41:3-6; 46:20-25.)

Trooper Mills also noticed three brand new reflective vests on the seat and two short-sleeved polo shirts hanging in the rear side windows so they were visible, which appeared "staged" given that Grajeda Sanchez was alone and due to the cold temperature; Grajeda Sanchez wore a lanyard around his neck that contained a credit card rather than a photo or picture with a business on it; and Grajeda Sanchez did not have any paperwork or receipts for his work. (*Id.* at 37:8-38:19.) Trooper Mills testified that during the initial approach, he also observed items that had tags and were all new in the truck and smelled "kind of a really strong odor of what [he] would say like laundry detergent smell or like - - it wasn't so much because there was a couple of -- some air fresheners that you could see visible," and "assum[ed] it could be a masking odor to try to cover up contraband odor." (*Id.* at 38:20-40:4.) At this point, Trooper Mills was "pretty sure this was going to be a trafficking vehicle just based on [his] prior stops that [he] had" and as a result, while returning to his squad car after his initial conversation with Grajeda Sanchez, he shined his light and looked underneath the truck bed. (*Id.* at 41:9-42:15; Gov't Ex. 1 at 5:00-5:07.)[8]

The Court finds based on Trooper Mills' experience in interdiction (*see* Gov't Ex. 9 (Trooper Mills' resume)) and testimony as to these facts that there was reasonable suspicion that Grajeda Sanchez was engaged in drug trafficking sufficient to justify extending the traffic stop. *See Murillo-Salgado*, 854 F.3d at 415 (finding extension of a

---

[8]     Government Exhibit 1 is Trooper Mills' video footage. The Court gauges the timing in the video from the time it begins until the end using an hour:minutes:seconds format.

traffic stop justified where the officer had specific training in the trafficking of illegal drugs and had participated in hundreds of drug investigations; ownership and control of the vehicle was unclear; the defendant provided improbable and inconsistent responses to the officer's questions, including whether he was an electrician or just a "helper"; and "[b]ased on [the officer's] admittedly limited electrical-wiring experience, [the officer] believed that the quantity of electrical wiring in the bed of the truck was insufficient in light of [the defendant's and passenger's] statements that they were transporting all of the wiring necessary to complete work on a 15,000-square-foot house"); *see also United States v. Sanchez*, 955 F.3d 669, 675 (8th Cir. 2020) (finding the officer had reasonable suspicion in part because although the occupants of the vehicle stated the purpose of their trip was for a two-to-three day paint job, there were no supplies present other than one can of paint, and stating a "reasonable officer could view the decision to bring along a single gallon of paint for a two-to-three day paint job as an awkward attempt to bolster a cover story"); *United States v. Lopez-Mendoza*, 601 F.3d 861, 865-66 (8th Cir. 2010) (presence of many air fresheners, along with other facts, gave rise to reasonable suspicion).

Moreover, when Trooper Mills returned to the truck to verify Grajeda Sanchez's name, he observed that his eyes were bloodshot and glassy, leading him to suspect fatigue or possible drug use.  (Dkt. 43 at 43:2-44:22.)  Trooper Mills then returned to his squad car, began the process of issuing a warning ticket for the frosted windows, and ran Grajeda Sanchez through EPIC, resulting in the discovery that he had a query from law enforcement in 2013 and two or three active drug investigations in Michigan and Illinois.

(*Id.* at 47:11-49:5.)  At that point, Trooper Mills had decided to search the truck and had called Trooper Ruppert for backup before getting further into the stop and search.  (*Id.* at 48:9-20.)  "An officer's suspicion of criminal activity may reasonably grow over the course of a traffic stop as the circumstances unfold and more suspicious facts are uncovered."  *Murillo-Salgado*, 854 F.3d at 415.  Trooper Mills testified at the hearing that "from the start walking up, all the way through the stop, the EPIC information coming back, what I'm seeing in the vehicle, nothing, . . . every next step we took completely supported what we're -- what my initial assumptions were that it was a trafficking vehicle."  (*Id.* at 55:21-56:20.)  He contrasted this case with stops where "your suspicion kind of goes away because they provide some paperwork, okay, that makes sense" and testified that when he said "assumptions," he meant "suspicions."  (*Id.* at 56:2-5, 56:9-10.)  Indeed, Trooper Mills' decision to call Trooper Ruppert demonstrates that he believed the truck was being used for drug trafficking.  *See Sanchez*, 955 F.3d at 676 ("These suspicious facts suggested to [the officer] the possible transportation of contraband, as demonstrated by his decision to call for the dog.").  The Court concludes that Trooper Mills testified to particularized facts, which considered in totality, amounted to reasonable suspicion that the truck was being used for drug trafficking activity.

**B.    The Scope of the Extension**

Grajeda Sanchez argues that the stop was unreasonably extended after the troopers were unable to locate evidence of controlled substances during their roadside search, including when the troopers continued the search at the DOT Garage.  (Dkt. 49 at 10-11.)

The Government responds that the extension of the stop was reasonable and lawful. (Dkt. 53 at 13-14.)

"An investigative detention may turn into an arrest if it 'lasts for an unreasonably long time or if officers use unreasonable force.'" *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) (quoting *United States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999)). "During an investigative stop, officers should employ the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the temporary seizure. The means used to effect the seizure must be objectively reasonable in light of the facts and circumstances confronting the officers." *Id.* (cleaned up). "In assessing the effect of the length of the detention, we take into account whether the police diligently pursued their investigation." *United States v. Place*, 462 U.S. 696, 709 (1983).

Here, Trooper Mills observed the majority of the facts giving rise to reasonable suspicion by the time he completed his initial approach about 4 minutes and 30 seconds into the stop, he called for a canine unit about 24 minutes after initiating the stop, and Trooper Ruppert and Canine Rocco arrived at the stop about 3 minutes and 10 seconds later. (Gov't Ex. 1 at 1:15-28:32.) Canine Rocco's first sniff began about 5 minutes and 11 seconds after he arrived with Trooper Ruppert, the troopers performed a hand search shortly thereafter, and Canine Rocco conducted his second sniff about 17 minutes after arriving at the stop. (*Id.* at 33:02-45:52.) Having reviewed the video footage and based on the troopers' testimony, there is no evidence suggesting that the troopers acted without diligence in calling for a canine unit, conducting the first and second canine sniffs, and

conducting the hand search.  Numerous cases support the conclusion that a detention of this length, and under these circumstances, is not unreasonable.  *See e.g., United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (en banc) (finding a 1-hour detention reasonable where law enforcement "acted diligently to verify his suspicions as quickly as possible" by "radio[ing] for the drug dog only about six minutes after stopping [the defendant], and specifically requested that a dog be sent as soon as possible from the closest possible location"); *see also Maltais*, 403 F.3d at 557 (finding a 90-minute to 2-hour detention of the defendant in the back of a patrol car, as well as a 2-hours and 55-minute detention before the defendant's arrest, reasonable and stating that given the circumstances, the "officers acted with diligence and pursued the quickest and least intrusive means of investigation reasonably available to confirm or dispel their well-founded suspicions that" the defendant "was engaged in drug trafficking").

Further, by the time the troopers decided to take the truck to the DOT Garage, both Trooper Ruppert and Sergeant Rauenhorst had independently observed facts suggesting to them that the truck was a staged vehicle being used for drug trafficking. Specifically, Trooper Ruppert testified that due to his observation of the items in the truck, including construction cones, a Styrofoam cooler with raw meat in it, tools, and vests, he formed the belief that the truck was staged.  (Dkt. 43 at 116:3-119:19.)  Sergeant Rauenhorst also testified that when he approached the truck, he thought it looked "staged" given the construction cones in the back, air fresheners, and because all the items in the truck were new, which was not typical for construction workers.  (Dkt. 43 at 152:12-155:12.)  It was "obvious" to Sergeant Rauenhorst that the truck was "set up for

illegal contraband hauling." (*Id.* at 155:17-157:4.) As to the decision to take the truck to the DOT Garage to continue the search, Trooper Mills testified that it was "extremely cold" on February 8, 2021, and was "negative 10, negative 9 that whole timeframe" with "five, ten mile an hour wind," which "definitely made it colder." (Dkt. 43 at 18:15-25.) Trooper Mills, Trooper Ruppert, and Sergeant Rauenhorst testified as to the reasons why they moved the truck to the DOT Garage, including because they believed the contraband was well hidden and doing so would give them access to better tools for searching, the risk of searching outside on the side of Interstate 90 in the cold weather, and because the wind was possibly interfering with Canine Rocco's ability to perform his sniffs. (*Id.* at 73:3-16, 124:1-125:18, 158:8-24; 164:7-22, 174:16-24.)

In view of these facts, the Court concludes that the troopers' decision to continue the search at the DOT Garage was reasonable and did not violate the Fourth Amendment. *See, e.g.*, *United States v. Padilla*, No. 4:15-CR-00144 KGB, 2016 WL 3546303, at *8 (E.D. Ark. June 23, 2016) ("Any arguments on this point fail because Mr. Padilla's initial consent lead [sic] to the search of the car on the highway which allowed the Troopers to view evidence of alleged tampering and/or the prior removal of the backseat. Once the Troopers saw this evidence, they had obtained reasonable suspicion to continue searching. At that point, the Troopers requested to change locations from the highway to the nearby garage to conduct a more extensive search. That Mr. Padilla withdrew his consent at that point and did not consent to the continuing search at the nearby garage does not negate the reasonable suspicion that the Troopers had already acquired."); *United States v. Sotelo-Lopez*, No. 12-40013-01-RDR, 2012 WL 1606025, at *9 (D. Kan.

May 8, 2012) (finding "removal of the vehicle from the county road to a garage for a further search was not a violation of the Fourth Amendment" where law enforcement had developed a reasonable suspicion that the defendant was engaged in criminal activity). Moreover, "[c]ourts must 'consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes.'" *Bloomfield*, 40 F.3d at 917 (quoting *United States v. Sharpe*, 470 U.S. 675, 685, 685 (1985)). Given the inclement weather, the concerns that the wind was affecting Canine Rocco's ability to detect contraband, the safety concerns arising from conducting a roadside search, and the numerous facts indicating that the truck was a staged vehicle being used for drug trafficking, the Court concludes that the decision to continue the search at the DOT Garage, under these circumstances, was reasonable.

**C.    Probable Cause to Search the Truck**

Grajeda Sanchez argues that the troopers did not have probable cause to search the truck, specifically disputing whether Canine Rocco really did alert at the engine during the second sniff. (Dkt. 49 at 13-14.) Grajeda Sanchez asserts that "it seems clear that Rocco did not alert nor indicate to the presence of drugs in the second canine sniff and the alleged alert is a fabrication after-the-fact, used to justify the troopers' conduct that followed." (*Id.* at 14.) In making this argument, he focuses on one of the trooper's suggestion to take the truck in because the contraband "could be buried," arguing this shows their intent to search the truck regardless of whether probable cause existed; the fact that none of the audio includes any words or communication about the alert during

the second sniff; and the fact that Sergeant Rauenhorst testified that Trooper Ruppert told him Canine Rocco had alerted, but there is no record of this on any audio.  (*Id.* at 13-14.)

The Government responds that the troopers' testimony indicates that they believe Canine Rocco alerted at the engine during the second sniff, and "[w]hether these canine Troopers communicated non-verbally or one was mistaken, even the most untrained ear can identify Rocco's clear indication that he was in the presence of controlled substances as he was atop the engine compartment."  (Dkt. 53 at 18 n.6.)

The Court has carefully reviewed the video footage of the stop and considered the troopers' testimony.  (*See* Gov't Exs. 1-3.)[9]  All three troopers testified that Canine Rocco alerted.  (Dkt. 43 at 70:18-71:6; 72:211; 123:21-124-22; 134:20-22; 157:21-158:7; 176:24-177:9.)  Moreover, while the Court does not pretend to be a qualified K-9 handler, the video does show Canine Rocco jumping excitedly and whining repeatedly while near the engine at the second sniff (Gov't Ex. 1 at 48:35-50:02), which was a change in Canine Rocco's behavior from when he was sniffing other areas of the truck (*see id.* at 45:52-50:20; *see also* Dkt. 43 at 71:5-6).  Consequently, notwithstanding any conflict between Sergeant Rauenhorst's testimony that he "was advised of an alert to the front of the vehicle" (Dkt. 43 at 158:2-3) and the absence of any such audio commentary, the Court finds the troopers' testimony that Canine Rocco alerted near the engine credible.  Canine Rocco's alert, combined with his certification, provides probable cause

---

[9]    Government Exhibit 2 is Trooper Ruppert's video footage and Government Exhibit 3 is Sergeant Rauenhorst's video footage.

to search the truck.  *See Florida v. Harris*, 568 U.S. 237, 247 (2013) ("[E]vidence of a

dog's satisfactory performance in a certification or training program can itself provide

sufficient reason to trust his alert.  If a bona fide organization has certified a dog after

testing his reliability in a controlled setting, a court can presume (subject to any

conflicting evidence offered) that the dog's alert provides probable cause to search.").

The Government also contends that probable cause existed to search the truck

even if the Court does not consider Canine Rocco's roadside alert.  (Dkt. 53 at 15-17.)

The Court agrees.  The Court has recounted the facts in detail above, and will not repeat

all of them again here.  Suffice to say that before Canine Rocco performed his second

sniff, the troopers had observed the inconsistencies between the truck's purported status

as a commercial vehicle used for contract cable installation and its registration to a

private party and lack of any company logo or markings; the lack of paperwork and

specifics about any cable installation projects; the apparent staging of traffic cones,

reflective vests, and polo shirts in the truck; the new-with-tags and clean or apparently

unused tools in the truck; the clean condition of the truck itself; Grajeda Sanchez's

hesitation in answering certain questions, including which company he contracted for or

where he had performed work, and vague answers to other questions; his identification of

"Soy Falls" as his departure point and of Laverne as his last stopping point; the fact EPIC

indicated that Grajeda Sanchez was the target of two or three active drug trafficking

investigations and his response that he had previously been arrested for "Cocaine in

Wisconsin"; and the inclusion of masking agents (bars of soap, air fresheners, and raw

fish or chicken) in the truck.  (Dkt. 43 at 22:13-23:15; 32:3-12; 37:8-39:19; 40:5-41:8;

46:16-47:13; 48:21-49:10; 55:10-56:24; 66:1-17; 116:3-117:19; 118:7-119:19; 152:21-155:13.) Further, Grajeda Sanchez's pulse was elevated to 120 beats per minute and said he was "cold and nervous." (*Id.* at 52:5-7.) The troopers also testified that based on their training and experience (which was substantiated by their resumes), they believed the truck was a staged vehicle used for drug trafficking. (*Id.* at 37:11-12; 117:20-118:21; 152:21-153:13; 155:5-12; *see also* Gov't Ex. 9 (Trooper Mills' resume); Gov't. Ex. 10 (Trooper Ruppert's Resume); Gov't Ex. 11 (Sergeant Rauenhorst's resume).) The Court concludes that the totality of these circumstances constitutes probable cause to search the truck for evidence of drug trafficking. *See United States v. Mayo*, 627 F.3d 709, 713-14 (8th Cir. 2010) (finding probable cause existed for the search of defendants' vehicle in part due to defendants' inconsistent travel stories and one defendant's criminal history of drug related offenses); *see also United States v. Engler*, 521 F.3d 965, 971 (8th Cir. 2008) ("In order to determine if probable cause exists, the totality of the circumstances must be assessed using a 'common sense approach.'") (citing *United States v. Valle Cruz*, 452 F.3d 698, 703 (8th Cir. 2006) (stating that when determining probable cause, the Court must consider an officer's "training and experience and give 'due weight' to any inferences" drawn from the facts in light of the officer's experience); *United States v. Hill*, 386 F.3d 855, 858 (8th Cir. 2004) (finding officer had probable cause to search vehicle in part because of the defendant's "reputation for engaging in drug activity" and "nervous behavior"); *United States v. Cervantes-Perez*, 2012 WL 3288674, at *6 (D. Minn. July 23, 2012) (finding officers had probable cause based in part on the officers'

observation of defendant's vehicle, including that it was extremely clean, had expensive rims, a single ignition key, two air fresheners, and "Santa Muerte card").

For all of these reasons, the Court therefore recommends denial of the Motion to Suppress Evidence.

## D.    Consent

Grajeda Sanchez also contends that the Government has not met its burden to show that he consented to any searches or seizures.  (Dkt. 49 at 11-15.)  The Government responds that Grajeda Sanchez repeatedly consented, that the troopers' conduct was reasonable and lawful, and that the scope of the search did not exceed Grajeda Sanchez's consent.  (Dkt. 53 at 18-23.)  Grajeda Sanchez challenges specific instances of alleged consent in his supplemental brief, and the Court addresses those arguments in the same order below.

### 1.    Encounter With Trooper Mills and Roadside Searches

Grajeda Sanchez contends that Trooper Mills did not seek consent to search the truck until Trooper Ruppert arrived with Canine Rocco and that aside from Trooper Mills' testimony, no other witnesses, audio, or written evidence exists showing he consented to the search of the truck on the roadway about 30 minutes into the stop, about the same time Trooper Ruppert arrived with Canine Rocco.  (Dkt. 49 at 7-14.)  Grajeda Sanchez also asserts that he did not freely or voluntarily give consent to the search and was "coerced by the situation to do so" given that he had been subjected to a "traffic stop twice as long as necessary, forced to stand in the bitter cold for field sobriety tests (three non-voluntary tests), given the warning ticket and asked a number of questions about his

travels in front of Trooper Mills' squad." (*Id.* at 12.) Grajeda Sanchez contends that the Government has the burden of proof as to consent. (*Id.* at 7.)

The Government responds that Grajeda Sanchez voluntarily consented to the search of his vehicle and "at multiple points afterward responded to questions or completed acts that demonstrated ongoing consent." (Dkt. 53 at 18-21.)

As a starting point, under the facts of this case, the Court declines to find the absence of consent simply because Trooper Mills was the only witness who testified that Grajeda Sanchez consented to the search and there is no audio recording or written consent. *See United States v. Carrate*, 122 F.3d 666, 669-70 (8th Cir. 1997) (finding the defendant voluntarily consented to a search of his vehicle where a video of the stop and subsequent search of the vehicle existed but there was no accompanying audio to "verify what statements were actually made" and where no written consent-to-search form or verbal admonition that he was free to leave was provided to the defendant); *see also Chaidez*, 906 F.2d at 381 (noting that "a search may be justified by a voluntary oral consent even in the absence of a valid written consent"). Trooper Mills' testimony that he asked Grajeda Sanchez for consent to search after giving him the warning ticket and his paperwork and that Grajeda Sanchez consented (Dkt. 43 at 58: 2-14) is not rebutted by any other evidence.

The Court next addresses Grajeda Sanchez's argument that his consent to the search of his truck was coerced. "The question of whether a consent to search was in fact 'voluntary' or was the product of duress or coercion, expressed or implied, is a question of fact to be determined from the totality of all circumstances.'" *United States v.*

*Alcantar*, 271 F.3d 731, 737 (8th Cir. 2001) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)).  The Eighth Circuit has held that the following characteristics should be considered in determining voluntariness of consent: "(1) the defendant's age; (2) the defendant's general intelligence and education; (3) whether the defendant was under the influence of drugs or alcohol; (4) whether the defendant was informed of his *Miranda* rights prior to the consent; and (5) whether the defendant had experienced prior arrests so that he was aware of the protections the legal system affords to suspected criminals."  *Id.* (citing *United States v. Hathcock*, 103 F.3d 715, 719-20 (8th Cir. 1997)); *see also Chaidez*, 906 F.2d at 381 (collecting cases).  Consent is voluntary if it was "the product of an essentially free and unconstrained choice by its maker" as opposed to "the product of duress or coercion, express or implied."  *Chaidez*, 906 F.2d at 380 (citation omitted).

The Court must consider the "totality of the circumstances" in determining whether consent given was voluntary and must consider the characteristics of the environment in which consent was given, including whether Grajeda Sanchez: "(1) was detained and questioned for a long or short time"; "(2) was threatened, physically intimidated, or punished by the police"; "(3) relied upon promises or misrepresentations made by the police"; "(4) was in custody or under arrest when the consent was given"; "(5) was in a public or a secluded place"; "or (6) either objected to the search or stood by silently while the search occurred."  *Id.* at 380-81 (collecting cases). "These factors are not to be applied mechanically, but serve as a valuable guide to [the] analysis."  *Flores*,

474 F.3d at 1104.  The prosecution has the burden of proving, by the preponderance of the evidence, that consent to search was freely given.  *White*, 81 F.3d at 780.

The Court has carefully reviewed video footage of the traffic stop and subsequent searches, and finds based on the totality of the circumstances, that the Government has met its burden to show Grajeda Sanchez's consent was voluntary.  (*See generally*, Gov't Exs. 1-3.)  At the time Trooper Mills obtained consent for the roadside search of the truck, Trooper Mills was with Grajeda Sanchez on the roadside while Trooper Ruppert waited by Trooper Mills' squad vehicle; the two were outside their vehicles on the public interstate; Trooper Mills did not display any weapons or touch Grajeda Sanchez; there is no evidence (or argument) that Trooper Mills used language or a tone of voice indicating that compliance was required; and Trooper Mills testified that Grajeda Sanchez was "cooperative and polite."  (*See* Gov't Ex. 1 at 26:30-30:46; *see also* Dkt. 43 at 52:3-54:24; 55:10-58:8; 59:2-60:2, 89:2-90:1.)  Moreover, Grajeda Sanchez was an adult at this time and there is no indication that he lacked sufficient intelligence or education to understand Trooper Mills' request to search the truck.  (*See* Def.'s Ex. 1 (showing Grajeda Sanchez's date of birth as in 1977).)  The results from the HGN test did not show any nystagmus or signs of drug use.  (*See* Dkt. 43 at 52:3-54:21; 89:4-90:1.)  While Trooper Mills did not inform Grajeda Sanchez of his *Miranda* rights, there is nothing on the record suggesting that Trooper Mills misrepresented Grajeda Sanchez's rights to obtain his consent.  *See White*, 81 F.3d at 780 n.3 (stating that "a law enforcement officer's failure to inform an individual of his right to refuse to consent does not preclude a finding of voluntariness"); *see also Alcantar*, 271 F.3d at 737 (finding that although the

defendant "was not advised of his right to refuse consent, that is not in and of itself sufficient to find that consent was not voluntarily given" as the defendant admitted "to having previous experience with the judicial system"). Additionally, Grajeda Sanchez had some experience with the criminal justice system, including an arrest for cocaine in Wisconsin (Dkt. 43 at 56:16-20), and was never told he was under arrest throughout the course of the search (Dkt. 43 at 99:18-21). These facts support a finding that he voluntarily consented. *See Chaidez*, 906 F.2d at 382 (listing relevant factors including "whether, because they had been previously arrested, they were aware of the protections afforded to suspected criminals by the legal system," and whether person was in custody or under arrest at the time of arrest and finding consent voluntary where the defendant was not a novice criminal and had been convicted of distributing heroin prior to the traffic stop).

Additionally, Grajeda Sanchez gave consent to the roadside search shortly after Trooper Mills had handed him the warning ticket and all other documents and conducted the HGN test, and there is no evidence of any threats or physical intimidation by Trooper Mills. (*See* Gov't Ex. 1 at 26:30-30:46.) Neither is there any evidence that Trooper Mills made promises or misrepresentation to Grajeda Sanchez to obtain consent to search the truck. Although, Grajeda Sanchez was in the back of Trooper Mills' squad car during the roadside search, Trooper Mills testified that due to the extreme cold temperature and wind Grajeda Sanchez "requested" to sit in his squad car as an alternative to standing outside on the roadway during the search. (Dkt. 43 at 58:19-20; 60:3-9; 99:22-100:2.) Grajeda Sanchez does not dispute that he made such a request (*see generally* Dkts. 28,

49), and moreover the Eighth Circuit has found that "even persons who have been arrested and are in custody can voluntarily consent to a search." *Chaidez*, 906 F.2d at 382 (finding the reasoning in *United States v. Velasquez*, 885 F.2d 1076 (3d Cir. 1989), apposite where the Third Circuit "perceived no coercion or overreaching" where an individual that had been stopped for a traffic violation and was sitting a police car consented to a search of her car, noting the "consent took place on the shoulder of a major highway during daylight hours" and while the defendant's "movement was curtailed, a traffic stop does not constitute the degree of custody associated with formal arrest in terms of its impact on consent") (cleaned up).

Grajeda Sanchez's actions further shows that the consent given was voluntary.  At no time during the roadside search did Grajeda Sanchez withdraw consent even though he had several opportunities to do so, including when Trooper Mills returned to his squad car to: ask him if it was "okay" to turn off the engine of the truck and to inform him that the troopers would be "run[ning] a dog on" the truck, to which he responded "sure" and "okay"; ask if "the back" was unlocked and Grajeda Sanchez responded "uh, yeah, it's unlocked" and without being prompted, asked Trooper Mills "do you want me to open it for you?"; and request a key to access the "side compartment."  (Gov't Ex. 1 at 31:49-31:55; 33:58-34:08; 36:26-34; *see also* Dkt. 43 at 62:13-24; 63:22-64:11.)  In fact, when Trooper Mills asked, "you got the key for that side?", Grajeda Sanchez responded "no, there's no key for it just any key would open it" and informed Trooper Mills that "you could try the ignition key."  (Gov't Ex. 1 at 36:26-34.)  This supports a conclusion that Grajeda Sanchez consented to the roadside search. *See White*, 81 F.3d at 780 (finding

consent voluntary where the defendant "made no objections to the search either before or after the search began, and even opened the trunk"). Moreover, Trooper Mills appears to have been seated in the car with Grajeda Sanchez during Canine Rocco's first sniff of the truck, which lasted about one minute and four seconds, and spoke with him immediately before the sniff, while Trooper Ruppert and Canine Rocco were preparing for the first sniff. (*See* Gov't. Ex. 1 at 33:04-34:08.) Grajeda Sanchez had ample opportunity to withdraw consent but did not do so.

While the roadside search lasted for about 19 minutes from the time Grajeda Sanchez gave consent to search, and about 50 minutes from the start of the traffic stop, at no point did Grajeda Sanchez object to the length of the search or the search itself. (*See* Gov't Ex. 1 at 1:17-51:07.) This renders continuation of the search "objectively reasonable." *See Alcantar*, 271 F.3d at 738 (finding an hour-long search was "objectively reasonable" where the defendant did not object to the length of the search); *Del Real*, 2010 WL 3258608, at *3 (finding consent voluntary where a "mere thirty minutes passed from the time the defendant was pulled over to the time the officer called the canine unit."). Moreover, prior to obtaining consent, Trooper Mills asked Grajeda Sanchez if there was any contraband in the truck. *See Alcantar*, 271 F.3d at 738 (noting that "when the police receive consent to search for items that can be hidden in different parts of a car, searching those areas is 'objectively reasonable'" and the officer "may conduct a sufficiently thorough search to find those items").

For all of these reasons and based on the totality of the circumstances, the Court concludes that Grajeda Sanchez knowingly, freely, and voluntarily consented to the search of the truck on Interstate 90.

### 2.    Encounter With Sergeant Rauenhorst and Search at the DOT Garage

Grajeda Sanchez argues no "clear evidence" exists to show that he consented to a 10-minutes drive to the DOT Garage for a "dismantling search," and that moreover, the consent given was limited in scope as he consented to a "quick" search to allow the troopers take a "peek underneath," but that the troopers exceeded the scope of that consent. (Dkt. 49 at 7, 15.) Grajeda Sanchez also contends that he was not free to leave throughout the course of the stop as the truck did not leave the troopers' custody and that he could not just drive away during the drive to the DOT Garage given that one of the troopers drove in front of his truck and two others drove behind him. (*Id.* at 15.)

The fact that Grajeda Sanchez was in the back of Trooper Mills' squad car at the time he gave consent to the continuous search at the DOT Garage does not by itself render the consent involuntary. *See Chaidez*, 906 F.2d at 382. However, a "consensual search may not legally exceed the scope of the consent supporting it." *Id.* "The scope of a consensual search is measured by what the typical reasonable person would have understood by the exchange between the officer and the suspect." *Lopez-Mendoza*, 601 F.3d at 867 (quoting *United States v. Brown*, 345 F.3d 574, 580 (8th Cir. 2003). "The scope of a search is generally defined by its expressed object, and therefore an officer may reasonably interpret a suspect's unqualified consent to search a vehicle for drugs to include consent to, inter alia: search containers within that car which might bear drugs;

probe underneath the vehicle; and open compartments that appear to be false, or puncture such compartments in a minimally intrusive manner." *Id.* (citations omitted).

Grajeda Sanchez argues that no "clear evidence" exists to show consent was given to drive the truck to the DOT Garage for a "dismantling search." (Dkt. 49 at 7.) The Court does not agree. At the time Sergeant Rauenhorst asked for consent to transport the truck to continue the search at a different location, the roadside search had been underway for about 19 minutes. (Gov't. Ex. 1 at 32:07-51:07.) Sergeant Rauenhorst asked Grajeda Sanchez "do you mind if we run" the truck "into the shop, it's just right up there(?)" "just to take a peek underneath" and Grajeda Sanchez responded "sure" and without being prompted, asked Sergeant Rauenhorst, "do you want me to open that door for you?", leading Sergeant Rauenhorst to tell the other troopers in the presence of Grajeda Sanchez "he said that's okay." (*Id.* at 51:06-51:20.) Grajeda Sanchez then opened "the door," noting "there's no lock on it." (*Id.* at 51:25-52:12.) One of the troopers asked Grajeda Sanchez if he "could drive [the truck] up there?" and he responded "yeah, if you want." (*Id.* at 51:20-51:25.)

Given the above facts, the Court finds that Grajeda Sanchez voluntarily consented to drive his truck to the DOT Garage and to a continuous search of his truck at the DOT Garage. *See Lopez-Mendoza*, 601 F.3d at 867 (finding consent voluntary where defendant responded "'go ahead' in direct response to" the officer's request to search). Moreover, there is nothing on the record showing Grajeda Sanchez withdrew consent to drive the truck to the DOT Garage or to a continuous search of the truck at the DOT Garage. *See id.* ("Conduct withdrawing consent must be an act clearly inconsistent with

the apparent consent to search, an unambiguous statement challenging the officer's authority to conduct the search, or some combination of both.") (citing *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005)).  Nor is there anything on the record showing that at the time consent was given, the troopers threatened or physically intimidated Grajeda Sanchez, made promises or misrepresentations to him, or told him that he was under arrest.  To the contrary, after providing consent, Grajeda Sanchez independently offered to open a side door to the truck and also opened the back door.  Grajeda Sanchez's actions bolsters the voluntariness of his consent and made the troopers' continuation of the search objectively reasonable.

As to Grajeda Sanchez's contention that the troopers had custody of the truck and he was not free to leave because one trooper drove in front of him and two others drove behind him, at the time this occurred, he had voluntarily consented to the searches and to driving the truck for the troopers to continue the search.  Moreover, there is no evidence that Grajeda Sanchez knew where the DOT Garage was or how to get there, so it is reasonable that one of the troopers would have driven in front of him to provide directions to the garage.  It is equally reasonable that the other two troopers would have driven behind him given the troopers' stated intention to continue the search at the garage based on the consent received.

Turning to the scope of the search, Grajeda Sanchez argues that his consent to a "quick" search to allow the troopers to take a "peek underneath" was limited to that but that the search was "anything but a 'quick' and non-intrusive 'peek.'"  (Dkt. 49 at 15.) The Eighth Circuit has held that "when the police receive consent to search for items that

can be hidden in different parts of a car, searching those areas is 'objectively reasonable'"

and the officer "may conduct a sufficiently thorough search to find those items."

*Alcantar*, 271 F.3d at 738.  The Government also cites cases where courts found that

searches did not exceed the scope of consent where law enforcement used language

similar to a "quick peek" ("look into the trunk" and "look and see") and the defendant did

not object to a more intrusive search.  *See Chaidez*, 906 F.2d at 383 (finding scope of

consent not exceeded where the defendant contended that he only authorized a search of

the trunk of his vehicle but did not object during the search and did not protest when the

officer searched beyond the trunk of the vehicle, and noting that a defendant's behavior

during a search is relevant when assessing the scope of consent); *Lopez-Mendoza*, 601

F.3d at 868-69 (concluding that the scope of the search was not exceeded where the

officer "asked only to 'look and see' and did not use a consent form" and where the

defendant argued that "'look' is not as broad as consent to 'search'"; finding the

defendant did not "attempt to retract or narrow" consent and that even though the officer

had requested to look "real quick," a 30-minute thorough search before drugs were found

did not exceed the scope of consent; and stating that "failing to object to the continuation

of a consent search makes the continued search 'objectively reasonable'") (cleaned up).

Here, however, it appears that Grajeda Sanchez was not in the DOT Garage during

the search and thus could not see (and object) if the search exceeded the scope of "just to

take a peek underneath."  (Dkt. 43 at 178:13-16.)  Under these circumstances,

notwithstanding Grajeda Sanchez's failure to object to any aspect of the roadside search,

it is more difficult to conclude that the search of the vehicle in the DOT Garage did not

exceed the scope of his consent.  *See, e.g.*, *United States v. Alcaraz-Arellano*, 441 F.3d

1252, 1260-61 (10th Cir. 2006) (stating that defendant "may be correct that his consent

did not extend to transporting the car to the sheriff's department and dismantling it there"

where "he consented only to a mere peek inside" and car was transported to the sheriff's

department and dismantled"); *United States v. Gooch*, 915 F. Supp. 2d 690, 715-18

(W.D. Pa. 2012) (finding defendant's consent to search "[j]ust your book bag" did not

constitute consent to search trunk where book bag was located).  The Court notes that

Sergeant Rauenhorst told Grajeda Sanchez that the DOT Garage search would take

"about 20 minutes," at which time Grajeda Sanchez said he would wait in the squad

vehicle and told Sergeant Rauenhorst that the side panel door was just frozen.  (Gov't Ex.

3 at 25:50-26:20; Dkt. 43 at 160:3-10.)  This arguably suggests consent to a more

extensive search at the DOT Garage than peeking underneath the truck.  However, the

Court need not decide this issue, because as explained in Section III.C, the Court finds

that the search conducted in the DOT Garage was supported by probable cause.

### E.      Grajeda Sanchez's Un-Mirandized Statements

As stated previously, at the hearing, Grajeda Sanchez stated his intent to seek

suppression of statements he made while seating in the back of the troopers' squad cars

before he was read his *Miranda* rights.  (Dkt. 43 at 183:18-25.)  Grajeda Sanchez re-

raises this issue in his post-hearing brief and requests suppression of those statements.

(Dkt. 49 at 16.)

At the hearing, the Government stated it did not intend to introduce those

statements in its case-in-chief, and re-states this in its post-hearing brief.  (Dkt. 43 at

184:3-11; *see also* Dkt. 53 at 8.)  Accordingly, it is recommended that Defendant's request be denied as moot based on the Government's representation.

* * *

Having considered the parties' arguments and entire evidence, the Court recommends denying Grajeda Sanchez's Motion to Suppress Search and Seizure.

## IV.    RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:**

1.    Defendant Gaspar Grajeda Sanchez's Pretrial Motion to Suppress Search and Seizure (Dkt. 28) be **DENIED**; and

2.    Defendant Gaspar Grajeda Sanchez's request to suppress statements made while seating in the back of the troopers' squad cars before he was read his *Miranda* rights be **DENIED AS MOOT** in view of the Government's representations that it does not intend to use these statements in its case-in-chief**.**

DATED: April 27, 2023                    <u>*s/Elizabeth Cowan Wright*</u>
                                       ELIZABETH COWAN WRIGHT
                                       United States Magistrate Judge

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within

14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).